**CASE NO. 23-1131(L)**

# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

---

GARY D. LECLAIR,

*Appellant,*

v.

LYNN TAVENNER,

*Appellee, Trustee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

---

**OPENING BRIEF OF APPELLANT**

---

Monica Taylor Monday
Andrew M. Bowman
David R. Berry
GENTRY LOCKE
P. O. Box 40013
Roanoke, VA 24022-0013
540-983-9300

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1131L          Caption: Gary LeClair v. Lynn Tavenner

Pursuant to FRAP 26.1 and Local Rule 26.1,

Gary LeClair
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☒NO

2.  Does party/amicus have any parent corporations?  ☐YES ☒NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☒NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☑YES ☐NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

    Appellant, Gary LeClair, is not the debtor. Appellee, Lynn Tavenner, is a party to this appeal in her capacity as the trustee.

    We anticipate that Ms. Tavenner will include the information requested above when filing her disclosure statement as the trustee.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David R. Berry                          Date:        2/16/23

Counsel for: Appellant, Gary LeClair

Print to PDF for Filing

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED...........................................................................2

STATEMENT OF THE CASE................................................................2

    I.   Factual Overview................................................................2

         a.   The Firm's evolution as a professional corporation...................3

         b.   The Firm's 2018 conversion to a PLLC...............................4

         c.   Article II: Only employees could hold Shares ..........................5

         d.   Article V: Only those who held Shares could be Members .......7

         e.   LeClair's resignation from the Firm...........................................8

         f.   The July 29, 2019 "Resolutions".................................................9

         g.   "Dissolution" under the LLC Act & Operating Agreement....................10

         h.   The Dissolution Committee's August 27, 2019 "Resolutions" ..............12

         i.   The bankruptcy petition & ESH List.........................................13

         j.   The Trustee's "plan" for the ESH List ......................................13

    II.  Procedural History..........................................................15

         a.   The Bankruptcy Court proceedings...........................................16

         b.   The District Court appeal ...........................................................19

SUMMARY OF ARGUMENT ..........................................................21

ARGUMENT ....................................................................................23

    I.   The Bankruptcy and District Courts erred in concluding that
LeClair remained a Member after terminating his employment..................24

a.  When his employment ended, LeClair's Shares were
"deemed sold and transferred" to the Firm ................................25

b.  "As soon as" LeClair "cease[d] to hold any Shares,"
he was "no longer [] a Member" of the Firm .........................26

c.  There were no exceptions ..........................................................27

d.  Section 5.03 said what it meant and meant what it said ...........................29

II. The Bankruptcy and District Courts erred in concluding that
the Firm was "dissolved" while LeClair was a Member ...............................33

a.  The July Resolutions did not dissolve the Firm
on July 29, 2019 ........................................................................34

b.  Dissolution required the "written consent <u>or</u> affirmative vote of the
holders of a majority of the <u>then outstanding</u> [Preferred] Shares"...........35

i.   The Firm could not have dissolved before July 31, 2019
without LeClair's "written consent <u>or</u> affirmative vote" ...................37

ii.  LeClair never gave his "written consent or affirmative vote,"
or otherwise ratified the Firm's dissolution .........................41

CONCLUSION .................................................................................47

REQUEST FOR ORAL ARGUMENT ................................................................47

CERTIFICATE OF COMPLIANCE ......................................................................49

CERTIFICATE OF SERVICE ..........................................................................50

# TABLE OF AUTHORITIES

## Cases

*Ames v. Am. Nat. Bank*,
163 Va. 1 (1934) ..........................................................................24, 30, 32

*Bentley Funding Grp., L.L.C. v. SK&R Grp., L.L.C.*,
269 Va. 315 (2005) ....................................................................24

*Berry v. Klinger*,
225 Va. 201 (1983) ....................................................................39-40

*Bolton v. McKinney*,
299 Va. 550 (2021) ....................................................................24

*Capitol Credit Plan of Tennessee, Inc. v. Shaffer*,
912 F.2d 749 (4th Cir. 1990) ....................................................1

*Chantilly Constr. Corp. v. Dep't of Highways & Transp.*,
6 Va. App. 282 (1988) ..............................................................32

*Flippo v. Csc Assocs. Iii*,
262 Va. 48 (2001) ......................................................................29

*Hager v. Gibson*,
108 F.3d 35 (4th Cir. 1997) ......................................................45

*Hitachi Credit Am. Corp. v. Signet Bank*,
166 F.3d 614 (4th Cir. 1999) ....................................................24, 32, 39

*IMWA Equities IX Co. v. WBC Assocs. Ltd. P'ship*,
961 F.2d 480 (4th Cir. 1992) ....................................................24

*In re Thompson*,
16 F.3d 576 (4th Cir. 1994) ......................................................1

*Kilby v. Pickurel*,
240 Va. 271 (1990) ....................................................................45

*Litton v. Wachovia Bank*,
330 F.3d 636 (4th Cir. 2003) ...................................................................34

*Old Fort Improv. Co. v. Lea*,
89 F.2d 286 (4th Cir. 1937) ......................................................................43

*Phillips v. Congelton, L.L.C.*,
403 F.3d 164 (4th Cir. 2005) ...................................................................25

*Phx. Renovation Corp. v. Rodriguez*,
258 F. App'x 526 (4th Cir. 2007) ............................................................24

*PMA Capital Ins. Co. v. US Airways, Inc.*,
271 Va. 352 (2006) ...................................................................................24

*Seward v. Am. Hardware Co.*,
161 Va. 610 (1933) ...................................................................................36

*Tm Delmarva Power v. Ncp of Va.*,
263 Va. 116 (2002) .......................................................................... 24, 37-38

*Va. Historic Tax Credit Fund 2001 LP v. Commissioner*,
639 F.3d 129 (4th Cir. 2011) ...................................................................14

*Vassar Foundry Co. v. Whiting Corp.*,
2 F.2d 240 (6th Cir. 1924) ........................................................................43

**Rules**

Bankruptcy Rule 1009 ...............................................................................16

Bankruptcy Rule 1007 ...............................................................................13

Federal Rule of Appellate Procedure 4 .......................................................1

Federal Rule of Appellate Procedure 6 .......................................................1

Virginia Rule of Professional Conduct 5.4 ................................................25

**Statutes**

11 U.S.C. § 101 ..............................................................................13

28 U.S.C. § 158 ................................................................................1

28 U.S.C. § 1291 .............................................................................1

Va. Code Ann. § 13.1-543 .............................................................3

Va. Code Ann. § 13.1-544 .............................................................3

Va. Code Ann. § 13.1-1002 ..........................................................31

Va. Code Ann. § 13.1-1023 .................................................. 30, 36-37

Va. Code Ann. § 13.1-1038.1 .......................................................31

Va. Code Ann. § 13.1-1040.1 .......................................................30

Va. Code Ann. § 13.1-1040.2 .......................................................31

Va. Code Ann. § 13.1-1046 .................................................. 10-11, 36

Va. Code Ann. § 13.1-1103 ............................................. 5, 25, 31-32

Va. Code Ann. § 13.1-1111 ...........................................................5

Va. Code Ann. § 13.1-1122 ....................................................10, 30

## **JURISDICTIONAL STATEMENT**

Gary D. LeClair ("LeClair"), appeals from an order entered on January 4, 2023 by the United States District Court for the Eastern District of Virginia. JA1031 ("Order"). In that Order, the District Court affirmed in part and reversed in part two prior orders entered by the United States Bankruptcy Court for the Eastern District of Virginia. *See* JA573; JA576. The District Court exercised appellate jurisdiction and reviewed those prior orders pursuant to 28 U.S.C. § 158(a), and then remanded the case to the Bankruptcy Court to, among other things, "correct the date of the [equity security holders list]" at issue in this appeal. JA1032.

On February 2, 2023, LeClair filed his Notice of Appeal to this Court within thirty days after entry of the District Court's Order. JA 1076-1090; *see* Fed. R. App. P. 4(a)(1)(A) and 6(a). LeClair filed his appeal "out of an abundance of caution," noting the District Court's Order may be final in that it left ministerial tasks for the Bankruptcy Court to address on remand. JA1078 (citing *Capitol Credit Plan of Tennessee, Inc. v. Shaffer*, 912 F.2d 749, 750 (4th Cir. 1990) and *In re Thompson*, 16 F.3d 576, 577 n.1 (4th Cir. 1994)). To the extent this Court agrees,[1] appellate jurisdiction is proper, here, pursuant to 28 U.S.C. §§ 158(d)(1) and 1291.

---

[1] Alternatively, if this Court concludes that the District Court's Order is not final or otherwise appealable, LeClair renews his request that the current appeal be dismissed, without prejudice, so he may pursue appellate review following the Bankruptcy Court's resolution of the case on remand. *See* JA1078.

## ISSUES PRESENTED

I.  Whether the District Court erred by affirming the Bankruptcy Court's erroneous denial of LeClair's Motion to Amend.

   a. Whether the District Court, like the Bankruptcy Court, erred in concluding that LeClairRyan, PLLC was dissolved on July 29, 2019.

   b. Whether the District Court, like the Bankruptcy Court, erroneously concluded that the Operating Agreement prohibited member withdrawal after July 29, 2019.

   c. Whether the District Court erred in concluding that the Operating Agreement did not require LeClair to vote for or give his written consent to the dissolution of LeClairRyan, PLLC.

   d. Whether the District Court erred by declining to address the Bankruptcy Court's erroneous findings that LeClair gave his "implied consent" and/or "written consent" to the dissolution of LeClairRyan, PLLC.

   e. Whether the District Court erred by declining to address the Bankruptcy Court's erroneous finding that LeClair ratified any vote to dissolve, and/or the dissolution of, LeClairRyan, PLLC.

## STATEMENT OF THE CASE

This bankruptcy appeal has little to do with bankruptcy law. The underlying facts, however, were developed through briefing, declarations, and testimony in the Bankruptcy Court. Those facts are largely undisputed, as summarized below.

### I.  Factual Overview

In 1998, LeClair and Dennis Ryan co-founded what is now known as LeClairRyan, PLLC (the "Firm"). JA311. They initially formed the Firm as a

2

partnership, and converted it to a professional corporation roughly one year later. JA311. At that time, each owned fifty percent of the Firm's stock. JA311.

### a. *The Firm's evolution as a professional corporation*

Over the next thirty years, the Firm grew from a "two-person shop" to a national practice with over three hundred attorneys in more than twenty offices. JA311. This expansion necessitated various modifications to the Firm's ownership, governance, and leadership. *See* JA236-264; JA316-392. All told, the Firm amended its "Articles of Incorporation" and corresponding "Shareholders Agreement" at least four times. *See* JA236; JA316.

By February 2014, the Firm had established two classes of stock – "Common" and "Preferred." JA236. Both classes carried voting rights, and the Preferred stock conferred additional voting protections on the Firm's Preferred shareholders. JA237-244. Those "Preferred Stock Protective Provisions" precluded the Firm from, among other actions, dissolving without the "written consent or affirmative vote" of the holders of a majority of the Firm's then outstanding Preferred stock. JA243-244.

The Firm also recognized that, as a professional corporation, it was subject to various requirements under Virginia law, including the "ownership requirement" of "Virginia Code §13.1-543.A." JA236-237; *see* Va. Code Ann. § 13.1-544(A). That requirement precluded non-attorneys from becoming shareholders of the Firm.

JA236-237. While subject to the ownership requirement, the Firm only allowed licensed attorneys "who [we]re employed by the Corporation" to hold stock. JA236.

LeClair served as the Firm's Chief Executive Officer until 2002 and, after an eighteen-month break, again until June 2011. JA311. He also served as Chair of the Firm's Board of Directors until 2015, and as a member of the Board until his final term ended in January 2016. JA311. Thereafter, LeClair did not serve in any day-to-day leadership roles at the Firm. JA311. He instead returned to the fulltime practice of law as an employee – and both Common and Preferred shareholder – of the Firm. JA311-312.

**b. *The Firm's 2018 conversion to a PLLC***

Two years after LeClair's final term on the Board ended, his successors determined it was "in the best interests of the [Firm] and its Members" to convert from a professional corporation ("PC") to a professional limited liability company ("PLLC"). JA312; JA. This determination was based on "recently adopted tax legislation" and "a desire to achieve a more efficient and flexible entity for tax purposes." JA320-321.

The Firm's shareholders approved the conversion and, in February 2018, the Firm adopted its "Fourth Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation, and Operating Agreement of LeClairRyan PLLC." JA316-391 (the "Operating Agreement").

4

The Operating Agreement governed the Firm's transition from a PC to a PLLC. It redefined the Firm's "shareholders" as "Members," and converted their Preferred and Common stock into an equal number of Preferred and Common "Shares" in the newly-formed PLLC. JA320-321. This meant that the PLLC's Members were the Firm's former shareholders, JA320, and that each of those Members held the same quantity of Common and Preferred "Equity" as before the conversion. JA321. The Operating Agreement also reflected that each of the Members were "employed" by the Firm. JA320 ("As of the date of this [Operating] Agreement, each Member is an individual duly licensed . . . in the practice of law, and is employed by the [Firm] or a direct or indirect subsidiary.").

### c. *Article II: Only employees could hold Shares*

The Operating Agreement[2] was clear that "only individuals . . . who we[re] employed by the [Firm]" could "hold Equity." JA346, §2.04(b); *see also* JA363, §4.02. This requirement persisted because the Firm, as a PLLC, was still subject to the "ownership requirement" that applied while it was a PC. *See* Va. Code Ann. §§ 13.1-1103, 1111; *compare* JA236-237 (defining "Restricted Ownership Period" applicable to the Firm, as a PC, in 2014), *with* JA334, §1.01(www) (defining "Restricted Ownership Period" under Operating Agreement) *and* JA346, §2.04(b)

---

[2] Unless identified in the text of this brief, specific sections of the Operating Agreement are cited as follows: JA__, §__.

(limiting ownership of "Equity" to "employees" during the Restricted Ownership Period). Accordingly, as before, the Firm enforced the "ownership requirement" by only allowing individuals who were "employed by" the Firm, as licensed attorneys, to "hold Equity." JA346, §2.04(b); JA363, §4.02.

Article II of the Operating Agreement consequently did not allow Members to keep their Shares after terminating their employment. Instead, each departing Member's Shares were "deemed" transferred to the Firm "as of [his or her] Termination Date." JA341, §2.02(b)(iii); JA344, §2.02(g). This process was detailed in Sections 2.02 through 2.08, which laid out the "exclusive mechanism for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09.

Section 2.02, in particular, required the Firm to "purchase and redeem" all of a departing Member's Shares "upon termination of employment." The rule was this:

> [I]n the event of [] the termination of a Member's employment with the [Firm] . . . , the [Firm] or its Assignees, as applicable, shall purchase and redeem from the Transferring Member . . . , and the Transferring Member shall sell to the [Firm] or its Assignees, as applicable, all [Common and Preferred Shares] held by the Transferring Member immediately prior to the termination of his or her employment.

JA339, §2.02(a). These Shares were automatically "deemed sold and transferred to the [Firm] as of the Termination Date," JA344, §2.02(g), with "Termination Date" defined as "the effective date of the termination of the Transferring Member's employment with the [Firm]." JA339, §2.02(a)(i).

6

#### d. *Article V: Only those who held Shares could be Members*

Whereas Article II of the Operating Agreement provided the "exclusive mechanism for the redemption, repurchase or acquisition of [] Equity," JA354, §2.09, Article V governed who could become or remain a "Member" of the Firm. JA364. Section 5.01 began by establishing that "new" Members could only be admitted "in connection with" an "issuance" or "transfer" of Shares permitted by Article II. JA364. This meant that only licensed attorneys who were "employed by" the Firm could be Members, because only they could "hold Equity." JA346, §2.04(b); JA363, §4.02

Section 5.03, in turn, addressed the consequences of "continu[ing]" or "ceas[ing]" to "hold any Shares":

> **No Withdrawal.** [1] A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in the PLLC Act.
>
> [2] So long as a Member continues to hold any Shares, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the [Firm] and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the [Firm] shall be null and void and of no force or effect.
>
> [3] As soon as any Person who is a Member ceases to hold any Shares, such Person shall no longer be a Member.

JA364, §5.03 (spacing added). These sentences linked the Firm's "Members" to those who "h[e]ld any Shares," and those who "h[e]ld any Shares" to its "Members."

Prior to dissolution and winding up, anyone who "h[e]ld any Shares" had to be a "Member" of the Firm. JA364, §5.03. Conversely, the only way for "any Person who [wa]s a Member" to "no longer be a Member" was by "ceas[ing] to hold any Shares." JA364, §5.03. Otherwise, Members could not be dissociated or "withdraw or resign" while "continu[ing] to hold any Shares." JA364, §5.03.

Importantly, however, Article V did not preclude the Firm's Members from terminating their employment. JA364. The Operating Agreement even defined a term for this: "'Withdrawing Member' means a Member who voluntarily terminates his or her employment with the [Firm] by giving at least thirty [] days' prior written notice of such termination, and who continues to render professional services" as an employee of the Firm in the interim. JA338, §1.01(vvvv). A Withdrawing Member then became a "Transferring Member" on his or her "Termination Date," JA339, §2.02(a), at which time his or her Shares were "deemed sold and transferred" to the Firm. JA344, §2.02(g). Immediately upon that transfer, "such Person" "cease[d] to hold any Shares" and was "no longer" a Member. JA364, §5.03.

### e.  *LeClair's resignation from the Firm*

The Firm's resignation-and-redeem rule was well understood. *See, e.g.,* JA289-290. In fact, after the PLLC conversion, dozens of Members voluntarily terminated their employment with the Firm. JA312. Those former employees were not considered "Members" after their employment ended. JA312.

By July 2019, the Firm only had 43 Members left. JA214-219. This was a consequence of the Firm's declining "revenue and profitability in recent years," which had "led to the departure of numerous attorneys." JA667. "[T]hose departures accelerated in 2019" and, in turn, further inhibited the Firm's "efforts to return to profitability." JA667.

The Firm recognized this reality. It "candidly wanted people to leave" – "to get off of the payroll and to make sure their client work was supported." JA401. The Firm even encouraged its Members to "leave" by waiving the "Notice Period" in the Operating Agreement, JA400-401, which would have otherwise required them to give at least 30 days' prior notice. JA344-345, §2.02(h).

With the "Notice Period" waived, LeClair tendered his resignation on July 26, 2019. JA313. It was a difficult decision, but LeClair decided to leave the Firm because its financial issues were affecting his ability to represent his clients. JA313.

The Firm accepted LeClair's resignation and his last day of employment was July 31, 2019. JA313-314. Until his Termination Date, however, LeClair remained a Member and held both Common and Preferred Shares, including 213.68 out of 420.51 (or 50.8%) of the Firm's then outstanding Preferred Shares. JA214-219.

### f. *The July 29, 2019 "Resolutions"*

Before LeClair's employment ended, the Firm held a meeting on July 29, 2019. JA266. Having tendered his resignation, LeClair was not "included in

determining the presence of a quorum" or "entitled to vote" at that meeting. JA379-380, §9.08(g). Nevertheless, various other Members agreed it was in the "best interests" of the Firm "that the Firm be dissolved and liquidated in accordance with, and pursuant to the Operating Agreement and applicable provisions of the [Virginia Limited Liability Company Act ("LLC Act")]." JA266. They then approved 15 corresponding "Resolutions of Members." JA266-272 (the "July Resolutions").

The July Resolutions, among other things: (i) delegated "all powers and functions of the Board of Managers" to a newly-formed "Dissolution Committee," JA267, and (ii) approved the dissolution of the Firm, consistent with the provisions of the Operating Agreement and LLC Act, "to be effective as of such date as the Dissolution Committee shall determine (the 'Dissolution Effective Date')." JA266.

### g. *"Dissolution" under the LLC Act & Operating Agreement*

Dissolution was, in the first instance, governed by the fourteen sections contained in Article 9 of Virginia's LLC Act.[3] *See* Va. Code Ann. §§ 13.1-1046 to -1050.5. Article 9 provides, as relevant here, that dissolution may occur as specified in the Operating Agreement. Va. Code Ann. § 13.1-1046(A)(1). The Firm's

---

[3] As a PLLC, the Firm was governed by Virginia's Professional Limited Liability Company Act ("PLLC Act"), which incorporated the provisions of the LLC Act unless otherwise inconsistent with the PLLC Act. *See* Va. Code Ann. § 13.1-1122.

Operating Agreement, in turn, specified two events, each of which needed to occur before the Firm could be dissolved. JA380, §9.08(i)(i); JA385, §11.01.

*First*, dissolution of the Firm required the "written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred] Shares." JA380, §9.08(i)(i). This requirement was one of several "Preferred Share Protective Provisions" in Section 9.08(i):

> At any time when Preferred Shares are outstanding, the [Firm] shall not, either directly or indirectly by amendment, merger, consolidation, statutory share exchange, or otherwise [liquidate, dissolve or wind-up] without (in addition to any other vote required by law, this [Operating] Agreement or the Management Statement) the written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred Shares] taken together as a single class, given in writing or by vote at a meeting, consenting or voting (as the case may be).

JA380, §9.08(i) and (i)(i). "The foregoing items [we]re in addition to any matters specifically reserved to the holders of the Preferred Shares under any other provision of [the Operating] Agreement." JA381, §9.08(i).

*Second*, dissolution of the Firm also was conditioned, as relevant here, upon "[a]n election to dissolve the [Firm] made by holders of a majority of the Common Shares." JA385, §11.01(a). Under the Operating Agreement and Va. Code Ann. § 13.1-1046(A)(1), assuming both of the foregoing events occurred, "the day on which" this second requirement was satisfied became the "effective" date for the "[d]issolution of the [Firm]." JA385, §11.02.

11

### h.  *The Dissolution Committee's August 27, 2019 "Resolutions"*

The Dissolution Committee never established a "Dissolution Effective Date" under the July Resolutions. JA266; JA1065. Instead, on August 27, 2019, the Dissolution Committee "unanimous[ly]" agreed it was "in the best interests" of the Firm to petition for Chapter 11 bankruptcy relief under federal law. JA211-213 (the "August Resolutions"). The Dissolution Committee consequently "resolved" to pursue bankruptcy, exercising the Board's powers that were delegated to it through the July Resolutions. JA211-212.

When it adopted the August Resolutions, the Dissolution Committee did not suggest the Firm was in dissolution. *See generally* JA211-213.  To the contrary, the Dissolution Committee, itself, acknowledged the July Resolutions had "authorized the dissolution of the [Firm] on such Effective Date *as shall be determined by the Committee*."[4] JA211. Moreover, LeClair – as *the* holder of a majority of the Firm's Preferred Shares until July 31, 2019 – had not given his "written consent" or otherwise "vote[d]" in favor of dissolution. JA518-519. Unlike dissolution, however, petitioning for bankruptcy did not require Member approval under the Operating Agreement. *See generally* JA316-391 (no mention of Firm bankruptcy).

---

[4] Unless otherwise noted, all emphasis in this brief has been added by LeClair.

### i. *The bankruptcy petition & ESH List*

The Firm filed its Chapter 11 bankruptcy petition on September 3, 2019 (the "Petition Date"). JA203-206. Then, on September 27, 2019, it filed a "list of equity security holders." JA214-219 (the "ESH List").

The ESH List was filed "pursuant to Rule 1007(a)(3) of the Federal Rules of Bankruptcy Procedure."[5] JA214. It stated that 43 individuals – including LeClair – were Members of the Firm "as of July 29, 2019." JA214. The ESH List, however, did not identify who the Firm's Members were "as of" the Petition Date or, for that matter, any date other than July 29, 2019.  JA214-219.

### j. *The Trustee's "plan" for the ESH List*

The bankruptcy case was subsequently converted to a chapter 7 proceeding in October 2019, at which point Lynn L. Tavenner was appointed to serve as "Trustee." JA685. Shortly thereafter, the Trustee received "inquiries from various former

---

[5] Rule 1007(a)(3) requires that "[i]n a chapter 11 reorganization case . . . the debtor shall file . . . a list of the debtor's equity security holders of each class showing the number and kind of interests registered in the name of each holder." The Bankruptcy Code, in turn, defines "equity security holder" as the "holder of an equity security of the debtor" – i.e., any person who owns a share or similar security in the debtor. 11 U.S.C. § 101(16)-(17).

attorneys" who wanted to know whether and when she would provide copies of their 2019 Schedule K-1s.[6] JA754.

The Trustee "formulated a plan" to deal with the Firm's tax returns. JA754. She used the previously-filed ESH List to allocate the Firm's 2019 tax liability among the 43 people who were "Members" on July 29, 2019. JA754-755. The Trustee was satisfied with this approach "given her understanding that, if needed, the returns could be amended for up to three years . . . in the event that she received additional relevant, reliable, and substantiated information." JA755; JA606-607.

The Trustee's "plan" was met with resistance when, in June 2020, the 43 people on the ESH List received K-1s for the entirety of 2019 based solely on their status as Members "as of July 29, 2019" – regardless of whether they had left the Firm in the interim. JA756. The Trustee "informed all who inquired that the [Firm] had neither the resources nor the obligation to respond to numerous inquiries about specific personal components of the K-1s." JA756. The Trustee did, however, indicate that her counsel "would compile" any "specific questions and/or comments" and then "review and address" them "as appropriate." JA756.

---

[6] A "Schedule K-1," or "K-1," is "used as part of the tax return to report a partner's share of income, credits, deductions and other items resulting from the partnership." *Va. Historic Tax Credit Fund 2001 LP v. Commissioner*, 639 F.3d 129, 135 n.6 (4th Cir. 2011) (internal citation omitted).

Despite opposition, the Trustee stuck to her "plan" – and, in subsequent tax years, she did the same thing. JA756-757. She passed the entirety of the Firm's 2020 tax liability to the same 43 people who were Members "as of July 29, 2019," thereby allocating millions in phantom income to LeClair and others who never received any portion of that income. JA756-757.

The Trustee "continued to receive inquiries, complaints, and, in certain instances, demands related to those who continue[d] to receive K-1s." JA757. She was also "informed by certain individuals that they believe[d] that the ESH List [wa]s inaccurate." JA758. Rather than amending it, the Trustee asked the Bankruptcy Court to approve her continued "reliance" on the disputed ESH List. JA729-746; JA751, JA762.

## II.   Procedural History

As a "party in interest," LeClair did two things: (1) he opposed the Trustee's "Motion to Authorize" her reliance on the ESH List, JA220-233, and (2) he filed his own "Motion to Amend" the ESH List. JA291-303. In both instances, LeClair took the same position: "The ESH List does not accurately reflect a list of the [Firm's] [M]embers at the end of 2019 or 2020." JA229; JA299-300. LeClair filed his Motion to Amend separately, however, because the Trustee had only asked the Bankruptcy Court to approve her reliance on the ESH List – *not* to address the accuracy of the ESH List. JA741 ("For avoidance of doubt, the Trustee *is not seeking* . . . a [ruling]

that the ESH List is completely accurate . . . . The Trustee is *merely seeking an order approving the Trustee's continued reliance on the ESH List* . . . subject to modification . . . by further order.").

Because LeClair did not – and does not – "object to the Trustee's reliance *on an accurate ESH List*," JA297, the critical question was – and remains – the accuracy of the ESH List. JA291-303. That was the basis for LeClair's Motion to Amend, JA297, and the denial of that motion is the basis for this appeal.

### a. *The Bankruptcy Court proceedings*

LeClair filed his Motion to Amend in accordance with Bankruptcy Rule 1009(a). JA291. He explained he should not have been included on the ESH List because he terminated his employment with the Firm on July 31, 2019. JA291-292, JA294. His Shares were consequently transferred to the Firm that same day and, as a result, he was no longer a Member when the Firm petitioned for bankruptcy a month later. JA299-300. Accordingly, LeClair asked the Bankruptcy Court to enter an order directing the Firm to amend the ESH List by making it effective "as of" the Petition Date and removing him from it. JA297, JA301.

The Trustee "d[id] not per se object to the relief [LeClair] sought" – "provided there [wa]s no adverse impact to the Estate or property thereof." JA429; JA493; JA503-504. The Trustee also "appreciate[d] the arguments [LeClair] presented," JA429, and she recognized that the accuracy of the ESH List hinged on the

16

"interpretation of [] various corporate governance documents." JA429; JA488. The Trustee nevertheless suggested an alternative "interpretation" of the Operating Agreement. JA436; JA488.

The Trustee's theory was that the Operating Agreement precluded the Firm's Members from transferring their Shares after the July Resolutions. JA436. She argued the July Resolutions constituted an "election to dissolve the [Firm]" and, as a result, the Firm was dissolved on July 29, 2019. JA438-439, JA440. Based on the second sentence of Section 5.03 (in isolation), JA436-437, the Trustee further argued that the 43 Members who held Shares on July 29, 2019 remained Members regardless of any "purported withdrawal after July 29, 2019." JA436. According to the Trustee, this meant LeClair was properly included on the ESH List because he remains an equity security holder "for tax and other economic purposes until such time as the [Firm] has been dissolved and completely wound-up." JA436; JA488. Again, though, she recognized "there may be alternative interpretations of the [Firm's] various corporate governance documents." JA441; JA493.

LeClair responded that the Trustee's interpretation of the Operating Agreement was incorrect. JA477-JA484. He explained that Section 5.03 did not preclude withdrawal or resignation where, as here, a Member "cease[d] to hold any Shares" – regardless of any prospect of dissolution. JA479-482. Indeed, the limitation on Member withdrawal or resignation only applied "[s]o long as a

17

Member continue[d] to hold any Shares," while the third sentence of Section 5.03 confirmed that LeClair was "no longer [] a Member" "[a]s soon as" he "cease[d] to hold any Shares." JA480-481.

LeClair alternatively argued that, even under the Trustee's interpretation, the July Resolutions were invalid to the extent they purported to dissolve the Firm on July 29, 2019. JA480-481. This was because LeClair, as the holder of a majority of the then outstanding Preferred Shares until his Termination Date on July 31, 2019, did not give his "written consent or affirmative vote" to dissolution as required by Section 9.08(i). JA480-481.

The Bankruptcy Court heard argument and evidence in connection with LeClair's Motion to Amend. JA495-563. During that hearing, the Trustee argued – for the first time – that LeClair was estopped from denying the validity of the ESH List or July Resolutions. JA528-533. The Trustee also reiterated her theory that Section 5.03 precluded the Firm's Members from redeeming their Shares after July 29, 2019. JA548-552.

At the conclusion of the hearing, the Bankruptcy Court clarified that it did not "intend to make any tax rulings." JA556-557. Instead, the court addressed the narrow issue before it: "who is or is not an equity security holder and whether [the ESH List] needs to be amended." JA557. It then made four rulings central to this appeal.

18

*First*, the Bankruptcy Court held "that the critical date [wa]s the dissolution date." JA557. *Second*, it held that the Firm was dissolved on July 29, 2019. JA557. *Third*, the court found that the July Resolutions were valid because LeClair either consented to dissolution by virtue of tendering his resignation or, alternatively, he later ratified the July Resolutions based on his "reliance on all of the things that [the Trustee] has done" in the bankruptcy proceeding. JA558. And *fourth*, the Bankruptcy Court held, as of July 29, 2019, the Firm's Members "could no longer withdraw pursuant to [S]ection 5.03" of the Operating Agreement. JA557.

The Bankruptcy Court ultimately ruled that LeClair, and anyone else who was a Member on July 29, 2019, "could not cease to be a [M]ember of the [F]irm" and would not be removed from the ESH List. JA559. It likewise ruled "that the [T]rustee may rely on that list," noting, "she can actually come to the court and ask me to approve a decision she makes in the exercise of a reasonable business judgment . . . [a]nd the court will obviously listen to my trustees." JA559. The Bankruptcy Court later memorialized its rulings in a memorandum opinion, JA564-572, and entered a corresponding "Order Denying Motion to Amend" on April 21, 2021. JA573.

### b. *The District Court appeal.*

LeClair appealed the Bankruptcy Court's rulings to the District Court. JA26. As before, he argued that the Operating Agreement did not preclude Member withdrawal in the wake of the July Resolutions. JA46-53. He further argued that the

Bankruptcy Court erred in finding the Firm was dissolved on July 29, 2019 because the July Resolutions merely authorized a committee to dissolve the Firm without actually dissolving it. JA53-56. Moreover, to the extent the July Resolutions could be construed to have dissolved the Firm, that aspect was invalid because LeClair (as *the* holder of a majority of "then outstanding" Preferred Shares) never consented to dissolution – whether in writing, implicitly, or by ratification. JA56-65.

On appeal, the Trustee recast what began as "another logical way to interpret [the Firm's] corporate governance documents," JA453, as the *only* way to interpret the Operating Agreement. JA 626-630.

The District Court did not hear argument from the parties. JA13; JA1045-1046. Instead, based on their briefs, it largely affirmed the Bankruptcy Court's "Order Denying Motion to Amend." JA 1055-1075. The District Court's rulings, however, were different than the Bankruptcy Court's.

As relevant here, the District Court held that: (1) the July Resolutions were valid – regardless of whether LeClair voted for, consented to, or ratified them – because LeClair was not entitled to vote at the July 29, 2019 meeting after he tendered his resignation on July 26, 2019, JA1058-1063; (2) the July Resolutions constituted an "Event of Dissolution" with an effective date of July 29, 2019, JA1064-1068; and (3) LeClair's "resignation of his membership on July 31, 2019, was 'null and void and of no force and effect'" following the "Event of Dissolution"

20

on July 29, 2019. JA1068-1072. The District Court then concluded that, although the ESH List must be redated "as of" the Petition Date,[7] LeClair nevertheless remained a Member at that time. JA1072-1073. The District Court entered its corresponding Order on January 4, 2023. JA1031-1032.

LeClair now appeals.

## <u>SUMMARY OF ARGUMENT</u>

LeClair must be removed from the ESH List because he was not a Member of the Firm once his employment ended on July 31, 2019. Sections 2.02 and 5.03 of the Operating Agreement confirm this. Section 2.02 required LeClair to transfer his Shares to the Firm on his last day of employment, JA339-345, and Section 5.03 precluded him from remaining a Member thereafter. JA364.

The Bankruptcy and District Courts erred in concluding otherwise. *First*, their rulings stemmed from a misinterpretation of Section 5.03, which was not a "post-dissolution" exception to Section 2.02. *Second*, their rulings were based on a misapplication of that nonexistent exception following a dissolution that never occurred. This brief addresses those issues in that order.

---

[7] "[O]n remand," the District Court directed the Bankruptcy Court to "correct the date of the ESH List to be September 3, 2019." JA 1032; JA1075. LeClair does not challenge that aspect of the District Court's Order.

Part I explains that, by operation of Section 2.02, all of LeClair's Shares were "deemed sold and transferred to the [Firm] as of [his] Termination Date." JA344, §2.02(g). Section 5.03 was not an exception to that rule. JA364. Rather, Sections 2.02 through 2.08 were the "*exclusive mechanism* for the redemption, repurchase or reacquisition of the Equity of a Member." JA354, §2.09. Section 5.03, by contrast, merely set out the membership consequences of "continu[ing]" or "ceas[ing]" to hold Shares. JA364. Specifically, Section 5.03 clarified that "[a]s soon as" LeClair "cease[d] to hold any Shares," he was "no longer [] a Member." JA364.

The inquiry should stop there.

Part II addresses the alternative. It explains that even if there was a "post-dissolution" exception to Section 2.02, the unwritten exception would not apply, here, because the Firm was not dissolved while LeClair was a Member. The "Preferred Share Protective Provisions" in Section 9.08(i) precluded the Firm from dissolving without the "written consent or affirmative vote of the holders of a majority of the Firm's then outstanding [Preferred] Shares." JA380. Because LeClair held a majority of the Firm's "then outstanding" Preferred Shares until his employment ended, JA214-219, the Firm could not have dissolved while he was a Member unless he consented to or voted for dissolution. He did neither. JA518-519. As a result, any "post-dissolution" exception to Section 2.02 would not have precluded the redemption of LeClair's Shares on July 31, 2019.

The Court should reverse the judgment below, and remand the case with instructions for LeClair's removal from the correctly-dated ESH List. *See* JA1032.

## **ARGUMENT**

The core question in this appeal is whether LeClair "h[e]ld any Shares" after he terminated his employment on July 31, 2019. The answer is found in the Operating Agreement – he did not:

> **Section 2.02(a).** In the event of the termination of a Member's employment with the Firm, the Firm shall purchase and redeem, and the Member shall sell to the Firm, all Shares held by the Member immediately prior to the termination of his or her employment.

JA339 (cleaned up). This transaction was "deemed" effective "as of the Termination Date." JA344, §2.02(g).

The District Court recognized "Section 2.02's blanket resignation-and-redeem rule," JA1070, but it did not apply it. JA1070-1071. Instead, like the Bankruptcy Court, JA568-569, the District Court conceived a new rule: "once the Members voted to dissolve the Firm, [LeClair] could no longer withdraw or resign from the Firm." JA1070.

The Bankruptcy and District Courts erred for two reasons: (1) the Operating Agreement did not include any "post-dissolution" exception to Section 2.02, and (2) even if it did, the Firm was not dissolved while LeClair was a Member. The Operating Agreement confirms these points.

## I.    The Bankruptcy and District Courts erred in concluding that LeClair remained a Member after terminating his employment.

"Under Virginia law, courts adhere to the 'plain meaning' rule in interpreting and enforcing a contract." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). "The guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Bolton v. McKinney*, 299 Va. 550, 554 (2021) (internal citations omitted). The underlying agreement must therefore be construed "as written" – without adding or removing terms. *PMA Capital Ins. Co. v. US Airways, Inc.*, 271 Va. 352, 358 (2006); *IMWA Equities IX Co. v. WBC Assocs. Ltd. P'ship*, 961 F.2d 480, 483 (4th Cir. 1992) ("The contract is to be construed as a whole, and effect given to every provision thereof if possible.") (internal citations omitted). In short: "It is the court's duty to declare what the instrument itself says it says." *Bentley Funding Grp., L.L.C. v. SK&R Grp., L.L.C.*, 269 Va. 315, 330 (2005) (quoting *Ames v. Am. Nat. Bank*, 163 Va. 1, 38 (1934)).

Where, as here, the terms of a written instrument – such as the Operating Agreement – "are clear and unambiguous, the interpretation of those terms presents a question of law." *Phx. Renovation Corp. v. Rodriguez*, 258 F. App'x 526, 537 (4th Cir. 2007); *Tm Delmarva Power v. Ncp of Va.*, 263 Va. 116, 119 (2002) (reviewing operating agreement using "basic rules of interpretation" applicable to contracts).

This Court reviews "conclusions of law reached by the district and bankruptcy courts" de novo. *Phillips v. Congelton, L.L.C.*, 403 F.3d 164, 168 (4th Cir. 2005).

      **a.** ***When his employment ended, LeClair's Shares were "deemed sold and transferred" to the Firm.***

As a PLLC, the Firm had a statutory and ethical responsibility to ensure that anyone who held "Equity" was licensed to practice law. *See* Va. Code Ann. § 13.1-1103; Va. Rule of Prof. Conduct 5.4(b). The Operating Agreement did that by only allowing the Firm's employees who were attorneys to "hold Equity." JA346, §2.04(b). On the front end, employment with the Firm was necessary to acquire Shares. JA346, §2.04(b); JA363, §4.02. On the back end, employment was necessary to keep them.

Section 2.02 governed the back end. JA339-345. It provided that, "in the event of [] the termination of a Member's employment with the [Firm]," the Firm "shall purchase and redeem . . . all Shares . . . held by the Transferring Member immediately prior to the termination of his or her employment." JA339, §2.02(a). This transaction occurred automatically, and all Shares were "deemed sold and transferred to the [Firm] as of the Termination Date." JA344, §2.02(g).

There was consequently no way for LeClair to terminate his employment with the Firm without transferring his Shares to the Firm. JA346, §2.04(a) and (b). By operation of Section 2.02, LeClair "sold and transferred" his Shares, and the Firm

"purchased and redeemed" his Shares, on his last day of employment – July 31, 2019. JA339, §2.02(a); JA341, §2.02(b)(iii); JA344, §2.02(g).

> **b.** *"As soon as" LeClair "cease[d] to hold any Shares," he was "no longer [] a Member" of the Firm.*

Whereas Section 2.02 and its neighboring provisions constituted the "exclusive mechanism" for the redemption of Shares, JA354, §2.09, Section 5.03 addressed the consequences of "continu[ing]" or "ceas[ing]" to "hold any Shares":

> **No Withdrawal.** [1] A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in the PLLC Act.
>
> [2] So long as a Member continues to hold any Shares, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the [Firm] and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the [Firm] shall be null and void and of no force or effect.
>
> [3] As soon as any Person who is a Member ceases to hold any Shares, such Person shall no longer be a Member.

JA364, §5.03. Whether a Member "continue[d]" or "cease[d]" to hold "any" Shares, however, remained a function of Section 2.02. *See* JA354, §2.09.

By its clear and unambiguous terms, the second sentence of Section 5.03 only applied "[s]*o long as a Member* <u>continue</u>[d] to hold any Shares." JA364. It did not apply, here, once LeClair "sold and transferred" *all* of his Shares when he terminated his employment. JA339, §2.02(a); JA341, §2.02(b)(iii); JA344, §2.02(g).

26

The third sentence of Section 5.03 applied instead. JA364. It was triggered "[*a*]*s soon as*" LeClair "cease[d] to hold any Shares." JA364. The moment that happened, LeClair was "no longer" a Member of the Firm. JA364.

### c. *There were no exceptions.*

The District Court generally recognized that "when a Member left the Firm . . . their shares were deemed transferred back to [the Firm]" – meaning their "Membership cease[d] on the last day of employment." JA1069. Nevertheless, like the Bankruptcy Court, JA568-569, the District Court misread Section 5.03 as "an exception to Section 2.02's blanket resignation-and-redeem rule." JA1070.

The Operating Agreement did not contain a single "exception" to Section 2.02. Nor could it. The Operating Agreement expressly stated the "provisions of Section 2.02 through Section 2.08 *constitute*[*d*] *the exclusive mechanism* for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09. Every subsequent "Article," "Section," and "Subsection" of the Operating Agreement was either "subject to" or applied "in accordance with" Section 2.02.[8] *See generally* JA354-391.

---

[8] Moreover, "any amendment to Section 2.02" that lengthened "the period of time within which" a Member's Shares were to be "purchased or redeemed" required the "affirmative consent or vote" of "each such affected Member." JA390, §12.14.

Section 5.03 illustrates this. JA364. It was dependent on Section 2.02, *not* an "exception" to Section 2.02. That is because the second sentence of Section 5.03 applied "so long as a Member continue[d] to hold any Shares," while the third sentence applied "[a]s soon as a Member . . . cease[d] to hold any Shares." JA364. Importantly, Section 5.03 did not dictate *whether* a Member "continue[d]" or "cease[d]" to hold any Shares. JA364. Rather, the "provisions of Section 2.02 through Section 2.08 constitute[d] *the exclusive mechanism* for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09.

Section 5.03 also did not, as the District Court put it, "explicitly except[] Membership termination from occurring post-dissolution." JA1070. To the contrary, Section 5.03 limited withdrawal and resignation "*prior* to the dissolution and winding up of the [Firm]." JA364. "Prior" did not mean "post," and no part of Section 5.03 sprang to life upon dissolution.

The limitation on withdrawal or resignation was operative for the entirety of the Firm's existence. The effect was that, "*prior* to the dissolution and winding up of the [Firm]," no one could withdraw or resign "*as a Member*" while keeping their Shares. JA364, §5.03. That limitation applied equally to LeClair and every other former Member "[s]o long as" they "continue[d] to hold any Shares." JA364. Just like the corollary: "[a]s soon as any Person who [wa]s a Member cease[d] to hold any Shares, such Person [was] no longer [] a Member." JA364. The Firm

28

consequently has many former Members, JA312, including LeClair, JA410, because only those who "continue[d] to hold any Shares" could continue to be Members. JA364, §5.03.

The Bankruptcy and District Courts misread Section 5.03 by transforming the second sentence into a post-dissolution redemption "exception" that did not exist. JA568; JA1068-1072. Section 5.03 could not have been "an exception to Section 2.02's blanket resignation-and-redeem rule," JA1070, because the limitation on *Member* withdrawal only applied to those who "continue[d] to hold any Shares." JA364, §5.03. Any other reading would require a different Operating Agreement – one that modifies Section 5.03 by deleting "[s]o long as a Member continues to hold any Shares," changing "prior" to "post," and removing the third sentence entirely. Courts cannot do that. *See Flippo v. Csc Assocs. Iii*, 262 Va. 48, 64 (2001) ("It is the duty of the court to construe the contract made between the parties, not to make a contract for them.").

### d. *Section 5.03 said what it meant and meant what it said.*

The Trustee urged the Bankruptcy and District Courts to make these modifications because, according to her, Section 5.03 would be meaningless without them. JA626-630. She questioned: "what is the point of [the second sentence of Section 5.03] if one can withdraw or resign regardless of dissolution or winding up by merely tendering one's shares?" JA629. That is the wrong question. The correct

question is "what the instrument itself says it says," *Ames*, 163 Va. at 38-39, and the answer to that question is in the text of Section 5.03.

Section 5.03 – and every sentence in it – was meaningful and purposeful as written. *See id.* ("The contract is to be construed as a whole, and effect given to every provision thereof if possible."). The "point" was to establish the Firm's own membership rules, as permitted by the PLLC Act. *See* Va. Code Ann. § 13.1-1023(A)(1) (authorizing operating agreements to, among other things, "regulate or establish . . . the relations of [] members"); Va. Code Ann. § 13.1-1122 (incorporating LLC Act into PLLC Act).

The first sentence of Section 5.03 opted-out of the default statutory-dissociation provision of the PLLC Act. It stated: "A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in the PLLC Act." JA364, §5.03. Without this sentence, the Firm's Members would have been subject to dissociation upon the occurrence of various statutory "[e]vents causing a member's dissociation." Va. Code Ann. § 13.1-1040.1. Because the Firm's Operating Agreement "otherwise provided," however, those statutory events did not trigger dissociation. *Id*. ("*Except as otherwise provided in . . . an operating agreement*, a member is dissociated . . . upon the occurrence of [various default] events.").

The second sentence opted-out of another statutory default provision. It prevented anyone who "continue[d] to hold any Shares" from withdrawing or resigning, "*as a Member*," "prior to the dissolution and winding up of the Firm." JA364, §5.03. This sentence was necessary because, without it, the default rules under the PLLC Act would have allowed the Firm's former Members to continue holding Shares. *See* Va. Code Ann. § 13.1-1040.2(A) ("Except as provided in . . . an operating agreement, the dissociation of a member shall not affect the membership interest [i.e., shares] held by the dissociated member" and the "former member . . . shall continue to hold a membership interest."); Va. Code Ann. § 13.1-1002 (defining "membership interest").

The third sentence addressed the inverse of the second. It prevented anyone who "cease[d] to hold any Shares" from remaining a Member. JA364, §5.03. This third sentence, like the one before it, linked the Firm's Members to those who held Shares. The third sentence was also necessary because under the default provisions of the PLLC Act, a person would not need to hold shares of a company in order to be a member of the company. Va. Code Ann. § 13.1-1038.1(C) ("Unless otherwise provided in . . . an operating agreement . . . [a] person may be admitted to a limited liability company as a member . . . without acquiring a membership interest."); Va. Code Ann. § 13.1-1103 (conditioning PLLC membership on whether a person is

"duly licensed . . . to render the same professional services" without requiring each member to hold a membership interest).

All three sentences of Section 5.03 "should be construed together." *Chantilly Constr. Corp. v. Dep't of Highways & Transp.*, 6 Va. App. 282, 293 (1988). So viewed, they "point" to the same conclusion: the Operating Agreement, not the default rules of the PLLC Act, governed the Firm's membership. Section 5.03 opted-out of the default rules by implementing three of its own: (1) no Member could be dissociated for any reason set forth in the PLLC Act, (2) everyone who held Shares was a Member, and (3) only those who held Shares could be Members. JA364. These three rules were perfectly consistent with the Operating Agreement as a whole – including Section 2.02 as the "*exclusive mechanism* for the redemption, repurchase or acquisition of a the Equity of a Member." JA354, §2.09.

Even if there were other ways that Section 5.03 could have been drafted, the relevant question is "what the instrument itself says it says," *Ames*, 163 Va. at 38, not what the Operating Agreement could have said instead. *Id*. Where, as here, that language was clear, unambiguous, and meaningful, it must be construed according to its "ordinary and popular meaning," as written, and as a cohesive whole. *Id*. at 38-39; *see Hitachi*, 166 F.3d at 628 ("The law will not insert by construction, for the benefit of a party, an exception or condition which the parties omitted from their contract by design.") (citation omitted).

32

\* \* \* \*

The Bankruptcy and District Courts misconstrued the Operating Agreement – in particular, Section 5.03 – by holding that LeClair remained a "Member" of the Firm after terminating his employment. Section 2.02 was clear that LeClair's Shares were transferred to the Firm when his employment ended – no exceptions. As a result, LeClair "cease[d] to hold any Shares" and was "no longer [] a Member" on July 31, 2019, before the Firm petitioned for bankruptcy. LeClair must therefore be removed from the ESH List.

## II.    The Bankruptcy and District Courts erred in concluding that the Firm was "dissolved" while LeClair was a Member.

If the Court agrees with the above analysis, it need not delve deeper. Whether and when the Firm "dissolved" is irrelevant because there was no "exception" to the rule that LeClair ceased to hold any Shares when his employment ended. The inquiry stops there.

The Bankruptcy and District Courts, however, did not stop there. Instead, after misreading Section 5.03 as a "post-dissolution" exception to "Section 2.02's blanket resignation-and-redeem rule," JA568-569; JA1068-1070, they misapplied that nonexistent exception. JA569; JA1071-1072. They misapplied it by reasoning that the Firm was dissolved on July 29, 2019, when some of its Members – but not LeClair, as a holder of a majority of the then outstanding Preferred Shares – adopted the July Resolutions. JA567-568, JA569-572; JA1058-1068. Those dissolution-

33

based rulings present mixed questions of law and fact subject to de novo review. *Litton v. Wachovia Bank*, 330 F.3d 636, 642 (4th Cir. 2003).

### a. *The July Resolutions did not dissolve the Firm on July 29, 2019.*

The Bankruptcy and District Courts treated the July Resolutions as having dissolved the Firm on July 29, 2019. JA568; JA1064-1068. That is incorrect.

The July Resolutions did not dissolve the Firm on July 29, 2019, and the Members who approved them made that clear. JA266-272. Those Members never resolved that the Firm "hereby is" dissolved. *See* JA266-268. They instead resolved that the Firm "shall be dissolved, consistent with the provisions [of the July Resolutions,] and *upon the Effective date established by the Dissolution Committee*." JA266. Then, they resolved that "the Dissolution Committee be, *and it hereby is*, empowered to determine the Dissolution Effective Date, and any such determination by the Dissolution Committee shall be *dispositive* for purposes of [the July Resolutions]." JA267. The Dissolution Committee, however, never established that date. *See* JA661-677.

The Dissolution Committee was not limited to establishing a "Dissolution Effective Date." *See* JA266-268. Its delegated authority included "all powers and functions of the Board," JA267, including the authority to petition for bankruptcy. JA211-213. The Dissolution Committee was consequently well-within its authority

to adopt the August Resolutions and pursue bankruptcy (under federal law) in lieu of dissolving the Firm (under the LLC Act and Operating Agreement). JA375, §9.01

The Dissolution Committee's August Resolutions, through which it "resolved" to petition for bankruptcy, were what ultimately came to fruition. *See* JA661-677. Tellingly, as recently as last year, the Trustee acknowledged the Firm had *still* not been dissolved and wound up. JA440 (arguing LeClair should remain an equity security holder "until such time as the [Firm] has been dissolved and completely wound up"); JA488 (declaring same, under penalty of perjury). That makes sense because the Dissolution Committee never established a Dissolution Effective Date. JA211-213; JA1065. It petitioned for bankruptcy instead. JA203.

The Bankruptcy and District Courts erred in concluding that the Firm was dissolved on July 29, 2019. The July Resolutions did not dissolve the Firm and neither did the Dissolution Committee, which never established a Dissolution Effective Date. Its decision not to do so is "dispositive." JA267.

### b. *Dissolution required the "written consent <u>or</u> affirmative vote of the holders of a majority of the <u>then outstanding</u> [Preferred] Shares."*

Even if the Dissolution Committee had established a "Dissolution Effective Date," JA265, the Firm still could not have dissolved without the "written consent or affirmative vote of the holders of a majority of the *then outstanding*" Preferred Shares. JA380, §9.08(i). This was among several "Preferred Share Protective Provisions" in the Operating Agreement:

> At any time when Preferred Shares are outstanding, the [Firm] shall not, either directly or indirectly by amendment, merger, consolidation, statutory share exchange, or otherwise [liquidate, dissolve or wind-up] without (in addition to any other vote required by law, this [Operating] Agreement or the Management Statement) the written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred Shares] taken together as a single class, given in writing or by vote at a meeting, consenting or voting (as the case may be).

JA380, §9.08(i) and (i)(i).

Section 9.08(i) did not yield to Sections 11.01 or 11.02, which allowed dissolution if and when the "holders of a majority of the Common Shares" *also* "elect[ed] to dissolve" the Firm. JA385; *see Seward v. Am. Hardware Co.*, 161 Va. 610, 626 (1933) ("All of the provisions of a contract should be construed together and those which appear in conflict should be harmonized whenever it is reasonably possible."). The Operating Agreement required approval from *both* "the holders of a majority of the then outstanding [Preferred] Shares," JA380, §9.08(i), *and* the "holders of a majority of the Common Shares." JA385, §11.01(a). Dissolution could not occur until both of those conditions precedent were satisfied. *See* Va. Code Ann. § 13.1-1046(A)(1). Without a "dissolution," there could be no "effective" date under Section 11.02.[9] *See* JA385; *see also* Va. Code Ann. § 13.1-1023(A)(1) (operating

---

[9] To be clear: Section 11.02 did not establish an "effective" date, here, for two reasons: (1) there was no "dissolution," as explained above, and (2) Section 9.08(i) was not satisfied, as explained below.

agreements may contain provisions "not inconsistent with the laws of the Commonwealth").

The Bankruptcy and District Courts recognized that dissolution required compliance with Section 9.08(i). JA571; JA1061. They also accepted that, on July 29, 2019, LeClair held "a majority of the [Firm's] then outstanding" Preferred Shares.[10] JA380, §9.08(i). Nevertheless, they both concluded that the Firm was dissolved on July 29, 2019 – even without LeClair's involvement. JA568-572; JA1058-1068. Those rulings were incorrect.

> i. *The Firm could not have dissolved before July 31, 2019 without LeClair's "written consent or affirmative vote."*

The District Court essentially rewrote Section 9.08(i) by adding a qualification that did not exist. Specifically, it "read[] Section 9.08(i) as requiring the vote of the majority of then outstanding Preferred shares *entitled to vote*." JA1061-1062 (emphasis original). The District Court added that italicized language, *but see Tm Delmarva Power*, 263 Va. at 119 (operating agreements must "be

---

[10] The Bankruptcy Court explicitly recognized that LeClair held a majority of the Firm's outstanding Preferred Shares on July 29, 2019, JA569, but the District Court mistakenly stated that LeClair "held forty-five percent of the then-outstanding Preferred Shares." JA1061. The ESH List confirms that, as of July 29, 2019, LeClair held 213.68 (or 50.8%) of the 420.51 Preferred Shares that were then outstanding. JA214-218. The actual percentage, however, would not have affected the District Court's analysis. JA1061 (addressing only "the need, or lack thereof, for LeClair to affirm or deny the resolution.").

construed as written, without adding terms that were not included by the parties."),
and then held that dissolution did not require LeClair's "written consent or
affirmative vote" because he was not "entitled to vote" after he tendered his
resignation. JA1061-1063. This led the District Court to conclude that the Firm was
"dissolved" on July 29, 2019 – regardless of whether LeClair voted for, consented
to, or otherwise ratified the Firm's dissolution. JA1063-1068. The Operating
Agreement did not allow that.

Section 9.08(i), similar to Section 2.02, had no (relevant)[11] qualifications. It
categorically prohibited the Firm from dissolving without the "written consent or
affirmative vote of the holders of a majority of the *then outstanding* [Preferred]
Shares." JA380, §9.08(i). This requirement did not fall to the wayside when LeClair
tendered his resignation on July 26, 2019. His Preferred Shares still remained
outstanding, JA217, and he continued to hold those Shares until they were
transferred to the Firm on July 31, 2019. JA410. In the interim, the Firm could not
dissolve without his "written consent or affirmative vote." JA380, §9.08(i).

To be sure, the District Court was correct that, by operation of Section 9.08(g),
LeClair was not "entitled to vote" at the July 29, 2019 meeting. JA379-380.

---

[11] While Section 2.02 was completely unqualified, *supra* at 27-29, Section 9.08(i)(i)
had one exception "when the then-outstanding Preferred Shares represent[ed] less
than ten percent (10%) of all of the then-outstanding Shares of the [Firm]." JA380.
Here, though, "[i]t remains undisputed that [Section 9.08(i)(i)] applies." JA1061.

LeClair's entitlement to "vote," however, was irrelevant to Section 9.08(i). The "Preferred Share Protective Provisions" extended to the "holders" of "then outstanding" Preferred Shares, JA380, §9.08(i), regardless of whether those Members were "entitled to vote." JA380-381, §9.08(g).

The Firm knew how to draw a distinction between "entitled to vote" and "then outstanding."[12] Section 9.08(i) was surrounded by language about whether and when Members were "entitled to vote," but Section 9.08(i) did not say "entitled to vote." It said "then outstanding." JA380. This was clearly intentional. *See Hitachi*, 166 F.3d at 628 ("The law will not insert by construction . . . an exception or condition which the parties omitted from their contract by design.") (citation omitted).

These phrases were meaningful and purposeful as written. *See Berry v. Klinger*, 225 Va. 201, 208 (1983) (giving "effect to all language of a contract" and "meaning . . . to every clause"). The phrase "entitled to vote" included only those "then outstanding" Shares of a particular class that were "entitled to vote," and excluded the "then outstanding" Shares that were not "entitled to vote." *See* JA379, §9.08(f); JA379-380, §9.08(g); JA381, §9.08(k). The phrase "then outstanding," by contrast, included *all* Shares of a particular class, including those "entitled to vote"

---

[12] *Compare* JA379, §9.08(f) (using "entitled to vote"), *and* JA379-380, §9.08(g) (same), *and* JA381, §9.08(k) (same), *with* JA380, §9.08(i) (using "then outstanding"), *and* JA390, §12.14 (same, for waiver of Preferred Share privileges).

as well as those not "entitled to vote." *See* JA380, §9.08(i); JA390, §12.14. The purpose of the broader "then outstanding" phrase was to ensure that a Member who tendered his resignation did not lose his ability to protect the rights of his "then outstanding" Preferred Shares, JA380, §9.08(i), until those Shares were "deemed sold and transferred" on his Termination Date. JA344, §2.02(g).

Moreover, the approval requirement in Section 9.08(i) was written in the alternative. It required *either* "written consent *or* affirmative vote." JA380, §9.08(i). The District Court acknowledged as much, and it considered whether the "or" was inclusive ("A or B, or both") versus exclusive ("A or B, but not both"). JA1062-1063. The Operating Agreement answered that question: "references to 'or' shall be deemed to be disjunctive but not exclusive." JA338, §1.02(a). Even without an interpretive guide, however, "or" certainly did not mean *neither* – which is how the District Court construed it. JA1063. *Berry*, 225 Va. at 208 ("We adhere to the 'plain meaning' rule in Virginia.").

Properly construed, Section 9.08(i) continued to protect LeClair until he was no longer the "holder[] of a majority of the then outstanding [Preferred] Shares." JA380. The Firm could not have dissolved without his "written consent or affirmative vote" while he was a Member. JA380, §9.08(i)(i). Nothing changed when LeClair tendered his resignation. Even if he could not "vote," however, the Firm still needed his "written consent" to dissolve before July 31, 2019.

> ii. *LeClair never gave his "written consent or affirmative vote," or otherwise ratified the Firm's dissolution.*

The Bankruptcy Court, unlike the District Court, recognized that Section 9.08(i) required LeClair's "written consent or affirmative vote" for the Firm to dissolve. JA570-571. The Bankruptcy Court also admitted two uncontested proffers, which conclusively established that LeClair "did not give his written consent" and "did not vote on" the July Resolutions. JA518-519. Nevertheless, the Bankruptcy Court held that LeClair implicitly "consented to the [] dissolution in writing" or, alternatively, "ratified" the Firm's dissolution. JA558; JA570-571. The Bankruptcy Court made these rulings, *sua sponte*, and both of them are belied by the record.

The Bankruptcy Court's primary ruling – that LeClair "consented to the [] dissolution in writing" – was based on one thing: LeClair's resignation notice. JA558; 570-571. LeClair sent that email on July 26, 2019, three days *before* the July Resolutions:

> Colleagues,
>
> I hereby withdraw as a member of LeClairRyan PLLC, effective immediately, and resign my employment effective as of 11:59 PM on August 4, 2019. I have been informed that the Firm has waived the 30-day Notice period set forth in Section 2.02(h) of the Operating Agreement. I will be joining Williams Mullen.
>
> Gary

JA410-411.[13]

---

[13] LeClair's Termination Date was moved to July 31, 2019 to ensure continuity of health insurance coverage for a colleague. JA313. This was discussed with, and

LeClair gave neither his implied nor express consent to dissolution. His resignation email said nothing about the "dissolution," "winding-up," or "liquidation" of the Firm – all operative terms in Section 9.08(i). JA380. It also did not use the equally-operative words "consent" or "vote." JA380, §9.08(i). Nor did it refer to any "resolution" or "resolutions." The email simply did not satisfy the requirement that LeClair provide "written consent . . . given in writing . . . consenting" to the liquidation, dissolution, or winding-up of the Firm. JA380, §9.08(i) and (i)(i). It was never meant to. *See* JA518 ("LeClair did not give his written consent to the July [Resolutions].").

Moreover, Section 9.08(i) required "written consent or affirmative vote," JA380, and no provision suggested implied consent as an alternative. *See generally* JA316-392. An alternative like that would wreak havoc on predictable and verifiable LLC governance. It would introduce significant uncertainty into the validity of actions that require member approval. Certifying validity for reliance by third parties would become extremely problematic and subject to potential abuse, especially if LeClair's short and to-the-point resignation email, in this case, could be implied to have been his written consent for dissolution as required by Section 9.08(i). JA380.

---

approved by, the Firm. JA313; JA403-404; JA406. It is undisputed that LeClair's last day of employment with the Firm was July 31, 2019. JA313; JA403-404; JA406.

The Bankruptcy Court's alternative ruling – that LeClair "ratified" the Firm's dissolution – was equally implausible. JA571-572. The District Court recognized this. *See* JA1063 (explaining, in its view, that "LeClair [did not] need to, *nor could he*, subsequently ratify the [dissolution] vote"); *see also* JA1058 (declining to address whether LeClair "ratified the action"). The Bankruptcy Court, however, did "its own research."[14] JA558. It held that LeClair "ratified the [July Resolutions] through his conduct in this [bankruptcy case]" because he did not contest the validity of the underlying bankruptcy proceeding. JA571-572; *see* JA558.

The Bankruptcy Court conflated "dissolution" under Virginia law with "bankruptcy" under federal law. Those were two separate and distinct statutory processes, one governed by Article 9 of the LLC Act and the other governed by the federal Bankruptcy Code. *See, e.g., Old Fort Improv. Co. v. Lea*, 89 F.2d 286, 287 (4th Cir. 1937) (discussing interplay between dissolution of a company, under state law, and "bankruptcy in the federal court"); *Vassar Foundry Co. v. Whiting Corp.*, 2 F.2d 240, 241 (6th Cir. 1924) (same). LeClair does not, and never has, contested the federal bankruptcy proceeding.

---

[14] At the hearing, the Trustee argued LeClair was "judicially and equitably estopped" from challenging the July Resolutions. JA527-533. The Bankruptcy Court based its ruling on "ratification," instead, which was an argument she never raised. JA558.

43

Member consent was not required under the Operating Agreement in order for the Firm to petition for bankruptcy. The Board had that sole authority. JA375, §9.01 (Unless "otherwise provided" in the Operating Agreement, "the Board shall have the authority to make all decisions and to take any and all actions (within or outside the ordinary course of the [Firm's] business) relating to the [Firm]."). The July Resolutions properly delegated the Board's authority to the Dissolution Committee, JA267, which, in turn, properly petitioned for bankruptcy in accordance with its August Resolutions. JA211-213.

Within the bankruptcy proceeding, however, LeClair has consistently maintained that the Firm could not have dissolved without the "written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred] Shares." JA380, §9.08(i). That has been his position ever since the Trustee raised dissolution, for the first time, in response to the Motion to Amend. JA436-440. Before then, LeClair had no reason to contest the validity of something that was contemplated but never occurred. The Trustee, herself, did not even mention "dissolution" as a basis for her reliance on (or the accuracy of) the ESH List, *see* JA729-742, and she recognized the difference between "state law dissolution" and federal bankruptcy proceedings. JA740. Indeed, the concept of dissolution was entirely irrelevant until, at the Trustee's insistence, the Bankruptcy and District

Courts declined to remove LeClair from the ESH List based on a nonexistent "post-dissolution" exception. *See supra* at 24-33.

These circumstances were a far cry from "ratification" of any dissolution. Ratification requires either: (1) an acceptance of the benefits of an unauthorized act "with full knowledge of the relevant facts," or (2) a failure to "promptly [] disavow" the act upon learning of it. *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) (quoting *Kilby v. Pickurel*, 240 Va. 271, 275 (1990)). LeClair did not "accept[] the benefits" of any "unauthorized act" because the Firm was never dissolved, *supra* at 34-40, and he "promptly [] disavow[ed]" the Trustee's competing theory three days after she raised it. JA436-441; JA477-482.

There was not even an "unauthorized act" that LeClair could have ratified until March 29, 2022, when the Bankruptcy Court first ruled from the bench that the Firm had been dissolved on July 29, 2019. JA495, JA558-559. LeClair did not ratify that purported dissolution, which would have been an "unauthorized act" had it occurred while he was a Member, by virtue of participating in the bankruptcy proceeding. The federal bankruptcy proceeding was not a Virginia "dissolution" proceeding.

The Trustee previously characterized this position as "disingenuous" because, in her view, LeClair's challenge to dissolution is a challenge to the validity of the bankruptcy proceeding. JA532. She is mistaken. LeClair has never "in any way"

45

challenged the validity of the bankruptcy proceeding or the Dissolution Committee's ability to file the underlying petition. JA555. Nor has he ever challenged the appointment of the Dissolution Committee or the corresponding delegation of the Board's authority to petition for bankruptcy. JA555. The "only" aspect of the July Resolutions LeClair has ever challenged is the Firm's purported dissolution. "That is it." JA555. His position has not changed.[15]

If, as the Trustee claims, certain Members attempted to dissolve the Firm on July 29, 2019, then that aspect of the July Resolutions would be invalid. That aspect, and only that aspect, would be invalid because the Firm could not have dissolved before July 31, 2019 without LeClair's "written consent or affirmative vote." JA380, §9.08(i). Still, though, the remainder of the July Resolutions properly delegated the Board's powers to the Dissolution Committee, JA267, which then had the power to petition for bankruptcy without Member approval. JA211-213.

Accordingly, the validity of the bankruptcy proceeding is not – and has never been – in question. The Firm did not need to dissolve before petitioning for

---

[15] The Trustee perhaps misread LeClair's reply brief in the Bankruptcy Court, where – in a footnote – he stated: "Even if the Trustee's proffered interpretation of Section 5.03 . . . was correct . . . the Firm did not enact a valid *Dissolution* Resolution (*as such term is defined by the Trustee*)." JA480. LeClair went on to clarify: "The *Dissolution* Resolution is invalid, void, and of no effect." JA481. LeClair's challenge to the so-called *Dissolution* Resolution was not a challenge to the July Resolutions at large, and he thoroughly explained the distinction between them during the hearing on his Motion to Amend four days later. JA555.

bankruptcy, and the Dissolution Committee did not need LeClair's "written consent or affirmative vote" to petition for bankruptcy. *See* JA380, §9.08(i) (omitting bankruptcy). For those same reasons, LeClair could not have "ratified" any dissolution of the Firm "through his conduct in this [bankruptcy case]." JA571-572.

## **CONCLUSION**

LeClair has not been a Member of the Firm since his employment ended on July 31, 2019. That is when his Shares were "deemed sold and transferred" to the Firm. JA344, §2.02(g). "As soon as" that happened, LeClair was "no longer" a Member because he "cease[d] to hold any Shares." JA364, §5.03. The Operating Agreement contained no post-dissolution exception to this rule, JA354, §2.09, but even if it did, that exception would not apply because the Firm was not dissolved while LeClair was a Member since he never gave his "written consent or affirmative vote." JA380, §9.08(i).

This Court should reverse the judgment below, and remand the case with instructions for the removal of LeClair from the correctly-dated ESH List. *See* JA1032.

## **REQUEST FOR ORAL ARGUMENT**

LeClair requests leave to present oral argument before the Court, and believes doing so will significantly aid the decisional process in this case.

**GARY D. LECLAIR**


By: /s/ David R. Berry
           Of Counsel

Monica T. Monday (VSB No. 33461)
Andrew M. Bowman (VSB No. 86754)
David R. Berry (VSB No. 90554)
GENTRY LOCKE
P.O. Box 40013
Roanoke, Virginia 24022-0013
Telephone: (540) 983-9300
Facsimile: (540) 983-9400
Email: monday@gentrylocke.com
Email: bowman@gentrylocke.com
Email: berry@gentrylocke.com

*Counsel for Appellant,*
*Gary D. LeClair*

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies that this brief complies with the page and type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) in that it contains 10,945 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6)it was prepared using Microsoft Word and contains 14-point, Times New Roman font.

By: /s/ David R. Berry
      Of Counsel

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the following counsel of record:

Paula S. Beran, Esq. (VSB No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Email: pberan@tb-lawfirm.com

*Counsel for Lynn L. Tavenner,*
*Chapter 7 Trustee-Appellee*

By: /s/ David R. Berry
Of Counsel