## CASE NO. 23-1131(L)

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

GARY D. LECLAIR,

*Appellant,*

v.

LYNN TAVENNER,

*Appellee, Trustee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

## RESPONSE BRIEF OF APPELLEE, TRUSTEE

Paula Steinhilber Beran
TAVENNER & BERAN, PLC
20 North 8th Street
2nd Floor
Richmond, VA 23219
804-783-8300

*Counsel for Appellee, Trustee*

## CORPORATE DISCLOSURE STATEMENT

Comes now Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 trustee (in such capacity, the "**Chapter 7 Trustee**" and/or the "**Trustee**") of the LeClairRyan bankruptcy estate (the "**Estate**"),  by counsel, and does hereby submit her Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1 as follows:

Appellee Lynn L. Tavenner, Trustee on behalf of the Estate declares that the Estate has no parent corporation and no publicly traded corporation currently owns 10% or more of its stock.

Respectfully submitted,

LYNN L. TAVENNER, CHAPTER 7 TRUSTEE

Dated: September 29, 2023
Richmond, Virginia

By: */s/        Paula S. Beran*
Paula Steinhilber Beran, Esquire (VSB No. 34679)
PBeran@TB-LawFirm.com
Tavenner & Beran, PLC
20 North 8th Street
Richmond, Virginia 23219
Telephone: (804) 783-8300
Email: pberan@tb-lawfirm.com
  *Counsel for Lynn L. Tavenner,*
  *Chapter 7 Trustee/Appellee*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE CASE ...............................................................1

SUMMARY OF ARGUMENT ..............................................................20

ARGUMENT ..................................................................................22

    I.   Mr. LeClair's Attempts to Retry this Matter on Purported Facts
       With No Evidentiary Support and/or New Arguments Should be
       Rejected.....................................................................................23

    II.  The District Court and the Bankruptcy Court Correctly
       Considered, Construed, and Harmonized Provisions of the
       Operating Agreement in Denying Mr. LeClair's Motion to
       Amend..........................................................................................26

        A.  Mr. LeClair Remained an Equity Member of the Shuttering
           Firm Even After He Left its Employ.....................................27

        B.  The Firm Was Dissolved While Mr. LeClair was a Member. ............31

CONCLUSION ..................................................................................37

CERTIFICATE OF COMPLIANCE ........................................................39

CERTIFICATE OF SERVICE ...............................................................40

# TABLE OF AUTHORITIES

## Cases

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985) ............................................................... 24

*Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*,
  250 Va. 402, 463 S.E.2d 661 (1995) ............................................. 31-32

*Commonwealth, Dep't of Highways & Transp. v. E. W. Yeatts, Inc.*,
  233 Va. 17, 353 S.E.2d 717 (1987) ................................................... 29

*Donnelly v. Donatelli & Klein, Inc.*,
  258 Va. 171, 519 S.E.2d 133 (1999) ................................................. 29

*Hager v. Gibson*,
  108 F.3d 35 (4th Cir. 1997) ............................................................... 36

*Hitachi Credit Am. Corp. v. Signet Bank*,
  166 F.3d 614 (4th Cir. 1999) ............................................................. 29

*IMWA Equities IX Co. v. WBC Assocs. Ltd. P'ship*,
  961 F.2d 480 (4th Cir. 1992) ............................................................. 27

*In re Comput. Dynamics, Inc.*,
  253 B.R. 693 (E.D. Va. 2000) .............................................. 24, 26, 33

*In re Health Diagnostic Lab., Inc. v. Arrowsmith*,
  578 B.R. 552 (Bankr. E.D. Va. 2017) ............................................... 14

*Kilby v. Pickurel*,
  240 Va. 271, 396 S.E.2d 666 (1990) ................................................. 36

*Levine v. Emplrs Ins. Comp. of Wausau*,
  887 F.3d 623 (4th Cir. 2018) ............................................................. 26

*Levy v. Kindred*,
  854 F.2d 682 (4th Cir. 1988) .............................................. 26, 29, 33

*Nantucket Inv'rs II v. Cal. Fed. Bank*
  61 F.3d 197 (3d Cir. 1995) ................................................................ 24

*TravCo Ins. Co. v. Ward*,
  284 Va. 547 (2012) ............................................................................ 27

*EEOC v. United Va. Bank/Seaboard Nat'l*
   555 F.2d 403 (4th Cir. 1977) ................................................................ 23

*Young Design, Inc. v. Teletronics Int'l, Inc.*,
   38 F. App'x 994 (4th Cir. 2002) ........................................................ 23

**Statutes**

11 U.S.C. §§ 101-1532 ............................................................................. 1

**Other**

Bankruptcy Rule 1009(a) ........................................................................... 1

Oxford English Dictionary (2020) .........................................................34

*Restatement (Second) of Contracts*
   § 207 (2019) ........................................................................................ 30

iv

## STATEMENT OF THE CASE

This appeal arises out of the bankruptcy case (the "**Case**" and/or "**Bankruptcy Case**") of LeClairRyan, PLLC ("**LeClairRyan**" and/or "**Debtor**" and/or "**Company**" and/or "**Firm**") which initially was filed by the Firm pursuant to 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") as a Chapter 11 liquidation, JA661-677, but which shortly thereafter was converted by the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**") to a liquidation  under Chapter 7 of the Bankruptcy Code. Upon conversion, Appellee, Lynn L. Tavenner, Trustee, not individually, but solely in her capacity as the Chapter 7 trustee (in such capacity, the "**Trustee/Appellee**" and/or the "**Trustee**") was appointed as the fiduciary to liquidate the Firm and, otherwise, administer the Debtor's bankruptcy estate (the "**Estate**"). JA685. In connection with the Chapter 7 Case administration, the Bankruptcy Court has held omnibus hearings approximately once a month and, in March of 2022, heard several motions including but not limited to two separate contested matters. JA495-563. One contested matter was a Motion to Amend Debtor's Equity Security Holders List Pursuant to Bankruptcy Rule 1009(a) (the "**Motion to Amend**") filed by Appellant Gary D. LeClair ("**Appellant**" and/or "**Mr. LeClair**"). The other contested matter heard on the same day (although it had been filed over 3 months earlier but had been continued at the Trustee's request to allow settlement

1

negotiations to proceed) was the Trustee's Motion For An Order Approving (I) The Trustee's Reliance on Debtor's List of Equity Security Holders and (II) Procedures For Obtaining Copies of Filed Tax Returns and Memorandum In Support Thereof (the "**Motion to Authorize**"). JA486-487. Upon conclusion of the hearings thereon, the Bankruptcy Court granted the Trustee's Motion to Authorize, JA556-559, and entered its Corrected Order Approving the Trustee's Reliance on Debtor's List of Equity Security Holders (the "**Order Granting Motion to Authorize**").  JA576. In addition, through a separate order ("**Order Denying Motion to Amend**"), JA573, the Bankruptcy Court denied Mr. LeClair's Motion to Amend. Thereafter, Mr. LeClair appealed to the United States District Court for the Eastern District of Virginia (the "**District Court**") the rulings contained in both orders. JA581. Upon the briefing of both matters and without needing any oral argument, the District Court (1) affirmed the Bankruptcy Court's Order Denying Motion to Amend and (2) affirmed in part, reversed in part, and remanded the Bankruptcy Court's Order Granting Motion to Authorize. JA1031. Mr. LeClair appealed to this Court and is questioning the ruling only as it relates to the Motion to Amend. [1]

---

[1] Mr. LeClair has not questioned in this Honorable Court the lower courts' rulings as it relates to the Trustee's Motion to Authorize.

The following is the undisputed evidence before the Bankruptcy Court, which then was included in the record before the District Court:

1.      Prior to 2018, LeClairRyan operated as a professional corporation, utilizing a cash basis for tax reporting purposes. Thereafter, in an effort to provide shareholders more take-home money, LeClairRyan began a process to convert to a Virginia professional liability company. The Trustee understands that LeClairRyan, in an effort to facilitate the forgoing, switched its tax reporting and accounting method to an accrual basis for a large portion of the first quarter of 2018 ("**2018 Short Year**"). In addition, upon LeClairRyan's filing of Articles of Conversion, the State Corporation Commission of Virginia issued a Certificate of Entity Conversion, effective March 4, 2018 , and LeClairRyan thereafter held itself out as LeClairRyan, PLLC. And after having utilized accrual basis accounting for about a quarter, in approximately April of 2018, LeClairRyan switched back to cash basis reporting for tax purposes. JA752-753.

2.      In January of 2019, LeClairRyan filed its tax return for the 2018 Short Year, but failed to pay amounts due and owing. The Trustee was informed by an IRS representative that, because of a discrepancy of over $20,000,000, this return was flagged almost immediately for audit, although no representative of the Debtor ever informed the Trustee of a pending audit.  In addition, in Summer of 2019, LeClairRyan filed its tax returns for the remaining part of 2018 (the "**Remaining**

**2018 Year**").  LeClairRyan utilized the accounting firm of Keiter, Stephens, Hurst, Gary & Shreaves, PC  ("**Keiter**") for its tax reporting in the 2018 Short Year and the Remaining 2018 Year. JA753.

3.       On July 29, 2019, the requisite number of members resolved to dissolve the Firm.  JA211, JA214, JA266, JA633. With actual knowledge that the Firm would be liquidating in the immediate future, JA406, Mr. LeClair  provided a letter of resignation on July 26, 2019, JA408,  and, accordingly, pursuant to relevant corporate documents was not eligible to vote on July 29, 2019. JA379-380.

4.       After the dissolution vote on July 29, 2019, the Firm began what it hoped would be an orderly winddown. JA667-669.

5.       Unfortunately, it realized the same was not possible outside of bankruptcy, JA669, and so LeClairRyan filed on September 3, 2019, ("**Petition Date**"), a petition for relief under Chapter 11 of the Bankruptcy Code to effectuate an organized liquidation of the Firm. As part of such process, the Debtor, not the Trustee, filed on September 17, 2019, its List of Equity Security Holders (the "**ESH List**"). JA214-218. The ESH List contains the names of forty-three attorneys, including Mr. LeClair, with the following statement "[t]he Debtor submits that the individuals identified below were the members of LeClairRyan PLLC as of July 29, 2019, which is the date the members resolved to dissolve the firm." JA214.

6.      Since October 4, 2019, (the "**Conversion Date**"), when the Case was converted to Chapter 7, the Trustee has served as the Chapter 7 Trustee. JA685. As of the Conversion Date, the Trustee became custodian of the Debtor's books and records and asserted control over all turned over to her. In addition, the Trustee filed her Motion for Immediate Authority to Operate Certain Aspects of Debtor's Business for a Limited Period and to Shorten Notice Thereof, and Memorandum in Support Thereof (the "**Operation Motion**"), and pursuant to numerous Orders of the Bankruptcy Court, the Trustee has been provided authority to operate certain aspects of the Debtor's business for a limited period of time (the "**721 Operations**"). JA752-753.  These "operations" are utilized to effectuate a continued orderly liquidation. JA834. They involve things such as collection of accounts receivable and transition of client files and other related information to respective clients, replacement attorneys, and/or queues for destruction. JA835-839. No legal services are included. JA839.

7.      Immediately upon conversion in October 2019, the Trustee  was faced with an IRS audit, an upcoming Form 5500 filing deadline in 11 days (with no requisite 401(k) plan audit having been completed), a 401(k) plan that had to be otherwise addressed, and relevant books and records that needed to be identified and quickly compiled to address these (among other) items. Furthermore, shortly after the Conversion Date, the Trustee began receiving inquiries from various former

attorneys regarding a timetable for receipt from the Trustee of her/his/their K-1 for 2019. And the 401(k) plan could not be properly addressed without nondiscrimination testing for 2019, which testing the Trustee understood required K-1information.  JA754.

8.      After discussions with the Office of the United States Trustee ("**UST**") about these items (among others), the Trustee proceeded in the exercise of her business judgement to devise a plan for the Estate's filing of 2019 tax returns, which plan included utilizing Keiter as the primary accounting firm assisting with the preparation of the 2019 tax returns, with input from Strickland & Co ("**Strickland**" ) - the firm the Trustee typically uses to assist with Chapter 7 estate tax items. Even though Keiter was more expensive than Strickland, various factors informed the decision to utilize Keiter. The Trustee, through counsel, disclosed all of the same at various hearings in the Bankruptcy Court. JA754.

9.      In addition to the greater expense of Keiter, consistent with Bankruptcy Court authority, the Estate also paid  independent contractors to help the Trustee gather the information necessary for the 2019 tax returns. JA755.  In the Debtor's books and records, the Trustee located a Fourth Amended and Restated Shareholders Agreement of LeClairRyan, A Professional Corporation and Operating Agreement of LeClairRyan PLLC, as amended (the "**Operating Agreement**"). JA758. Section 5.03 of the Operating Agreement provides, in pertinent part:

6

> So long as a Member continues to hold any Shares, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company **and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void and of no force or effect**.

JA364, JA758 (emphasis added).    Furthermore, Section 11.02 of the Operating Agreement provides that "Dissolution of the Company shall be effective on the day on which the event described in Section 11.01 occurs . . ." JA385. And Section 11.01 (a) of the Operating Agreement lists as a requisite act to trigger dissolution "[a]n election to dissolve the Company made by holders of a majority of the Common Shares." JA385. Additionally, Section 2.02 (j) of the Operating Agreement provides:

> Separation Agreement.  Upon the termination of the employment of a Member for any reason other than the death of such Member, the Transferring Member has the right to receive certain payments and benefits, and to clarify and confirm those rights and benefits, the **Transferring Member and the Company hereby agree to execute the Company's standard form Separation Agreement maintained on file with the Company's General Counsel.**

JA345 (emphasis added).

10.    The Trustee located in the Debtor's books and records numerous references to and/or actual separation agreements (the "**Separation Agreements**" and each a "**Separation Agreement**") for members who withdrew prior to 2019. Each Separation Agreement the Trustee reviewed provided a date certain for a defined Separation Date and provided that the Separation Date is the date that he/she/they "will no longer be a Member, Officer, Director or employee of the Firm."

7

Each also provided that the member's common shares "will be deemed to have been sold and transferred to the Firm on the Separation Date." Based on information found in the Debtor's books and records, the Trustee understood that LeClairRyan stopped using the Separation Agreement in late November and/or early December of 2018 and thereafter instituted a practice of memorializing a member's withdrawal through a Member Separation Memorandum (the "**Separation Document**"). JA759. Paragraph 1 of said Separation Document provides a date certain for a Separation Date. And paragraph 2 of the Separation Document provides "As of the Separation Date, Member will no longer be a Member. . ." JA764. Furthermore, Section  3 (a) provides:

> All of the Member's Common Shares will be deemed to have been sold and transferred to the Firm as of the Separation Date. In addition, the Firm has exercised its right to purchase and redeem any and all Preferred Shares owned by Member effective as of the Separation Date.

JA764. While the Trustee located a Separation Document for certain individuals who withdrew in 2019, the Trustee located in the Debtor's records neither a finalized Separation Agreement nor a Separation Document for the individuals listed on the ESH List including Mr. LeClair. JA759.

11.     Based on the corporate resolution (the "**Dissolution Resolution**"), JA266-272, the Trustee located in the Debtor's book and records, the Trustee determined that the members of LeClairRyan voted on July 29, 2019 to dissolve the Firm. JA760. The ESH List also indicates that July 29, 2019 was "the date the

members resolved to dissolve the firm." JA214. As such, the requisite number of members elected to dissolve the Firm on July 29, 2019 and as reflected in the Dissolution Resolution,   Richard W. "Deke" Bowerman, C. Erik Gustafson, Christopher J. Lange, and Lori D. Thompson were elected to serve as the Dissolution Committee of the Firm (the "**Dissolution Committee**"). JA266-272.

12.     The Trustee found no document demonstrating that any member of the Firm took requisite action prior to adoption of the Dissolution Resolution to change the Debtor's tax status from a flow through taxpayer to an entity that is taxed at the corporate level. Furthermore, she found no document that suggests, let alone demonstrates, that any member of the Dissolution Committee took requisite action before the Petition Date to change the Debtor's tax status from a flow through taxpayer to an entity that is taxed at the corporate level. JA439.

13.     The Trustee also reviewed documents filed with the Bankruptcy Court. For example, on the Petition Date, in addition to the bankruptcy petition, indicating that the Debtor's status as  a "Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)," Ms. Lori D. Thompson, as the chair of the Dissolution Committee signed a declaration under penalty of perjury, representing that LeClairRyan is a "Virginia professional limited liability company." JA661-677.

14.    After reviewing all of this information contained in the Debtor's books and records as well as information provided to the Bankruptcy Court in connection with the Debtor's bankruptcy filing, when asked by Keiter for information related to equity ownership, the Trustee, provided on January 31, 2020, through counsel, to Keiter the ESH List as filed by the Debtor. Notwithstanding that the Trustee, her professionals, and independent contractors began gathering and providing information to Keiter beginning in early 2020, given the condition of the Debtor's books and records with respect to these tax items, it took substantial time at great cost to the Estate to finalize the 2019 tax returns. JA433.

15.    In an ongoing effort to assist former attorneys, notwithstanding the tremendous task given the state of the Debtor's books and records with respect to these tax items and recognizing the ability to amend in the event of receipt and review of additional relevant information relating to the same, the Trustee  moved forward to finalize the returns. She ultimately filed the 2019 tax returns in June of 2020 to facilitate members' receipt of K-1s that they were so desperately seeking given her understanding that, if needed, the returns could be amended for up to three years after filing. JA433.

16.    As part of the 2019 federal tax return, "yes" was marked for the question "Is the partnership electing out of the centralized partnership audit regime under section 6221(b)?" Notification of the same was provided to all requisite parties;

K-1s were transmitted to all requisite parties with a transmittal letter. Shortly after transmitting the K-1s, the Trustee learned that (a) there were questions about the K-1s and (b) individuals desired a copy of the tax return as filed. She also learned that individuals were seeking information directly from Keiter and/or the Estate's independent contractors without the Trustee's knowledge or consent. JA434.

17.     The Trustee tried to accommodate the needs of former lawyers but was upfront and honest indicating that the same must be done within the confines of the Bankruptcy Code and the Trustee's duties. The Trustee informed all who inquired that the Estate had neither resources nor the obligation to respond to numerous inquiries about specific personal components of the K-1s. The Trustee also requested that, to the extent there were specific questions, the same should be forwarded to her counsel, who would compile and, thereafter, the Trustee would review and address as appropriate within the construct of this particular matter.  The Trustee also welcomed suggestions that were within the parameters of the Bankruptcy Code. JA434.

18.     The Trustee and her professionals (at the Trustee's direction) also provided to all who inquired information about obtaining a return copy for the 2019 tax year, which redacted (or as referred to in the tax world – masked) personally identifiable information ("**Masked Return Copy**"). Thereafter, the Trustee received a few requests for a Masked Tax Return Copy for the 2019 tax year, and she provided the same through the aforementioned process. JA434-435.

19.    After discussions with the UST, in the exercise of her business judgement, the Trustee determined that it would be in the best interest of the Estate to solely utilize Strickland to assist with the preparation of the 2020 tax returns.  These returns were filed on or about March of 2021. As part of the 2020 federal tax return, "yes" was marked for the question "Is the partnership electing out of the centralized partnership audit regime under section 6221(b)?" Notification of the same was provided to all requisite parties; in late March 2021, K-1s were transmitted to all requisite parties with a transmittal letter. Furthermore, the Trustee implemented procedures to obtain Masked Tax Return Copies for the 2020 tax year similar to those in place for the 2019 tax year. JA435.

20.    The Trustee, with the assistance of her professionals and wind-down team, also attempted to locate all information requested by the IRS in conjunction with the 2018 IRS Audit. The Trustee provided certain information to the IRS. Unfortunately, notwithstanding an extensive amount of diligence, the Trustee was unable to locate in the Debtor's books and records a majority of the information that the IRS maintained was necessary. As a result, the Trustee contacted, directly and through her professionals, former officers, and directors of the Debtor, as well as Keiter who had assisted in the preparation of the 2018 Short Year Return, to obtain insight as to the basis for

12

information/amounts contained in the 2018 Short Year Return. Based upon those communications, the Trustee understood there was a substantial amount of backup to support the figures used on the return, including those relating to adjustments for and/or devaluation of accounts receivable, and the same should have been contained within the Debtor's books and records. Once again, notwithstanding an extensive amount of additional diligence, the Trustee was unable to locate in the Debtor's books and records the bulk of the required supporting information. Based upon communications with former officers and directors, the Trustee also understood that the backup documentation could be explained by, and likely located through, a certain former employee of the Debtor. Unfortunately, while extremely professional and desiring to assist, said individual could neither explain nor point to documents to support the extensive adjustment for and/or devaluation of accounts receivable contained in the 2018 Short Year Return that had resulted in the audit. As a result, the Trustee was unable to provide to the IRS the complete documentation it maintained was required to support aspects of the Debtor's 2018 Short Year Return. The Trustee did convince the IRS to make certain modifications and as such requested authority from the Bankruptcy Court to execute documents related to proposed adjustments. Absent the execution of those documents, the Trustee understood that the IRS would completely disallow certain items in the 2018

13

Short Year Return, which could have resulted in millions of additional dollars in priority claims to the detriment of other creditors and the Estate. Thus, in the exercise of her  business judgment, the Trustee respectfully submitted that the relief requested was in the best interest of the Estate. JA720-722. No party objected to this request. JA156-157. The Bankruptcy Court entered an order authorizing said relief. JA726-728.

21.    In connection with the Estate's returns for the 2019 and 2020 tax years, notwithstanding the aforementioned communication and processes to obtain Masked Tax Return Copies, the Trustee continued to receive inquiries, complaints,  and, in certain instances, demands related to those who continue to receive K-1s.  For example, on September 1, 2021, the Trustee was requested to "clarify" with taxing authorities "that LR ceased being a tax flow through taxpayer on the day that the last member's employment was terminated" and to pay on "LR's income since then."  The Trustee was also requested to "address this issue and correct the erroneous designations and K-1's." JA757.

22.    Given that the Trustee possessed no authority to change the Debtor's tax status as articulated in numerous opinions including but not limited to *In re Health Diagnostic Lab., Inc. v. Arrowsmith*, 578 B.R. 552, 569 (Bankr. E.D. Va. 2017), she conveyed the same in response to such demand as well as informed the demanding individual that she was not in a position to "clarify that

LR ceased being a tax flow through taxpayer." The Trustee, through counsel,

explained the same as follows:

> . . . neither the bankruptcy code nor the tax code allow for a trustee to choose the tax status of an entity (as confirmed in another case by the presiding Judge of the LeClairRyan bankruptcy case). As such, the Trustee proceeded to prepare and file tax returns under the same status as existed when she was appointed . . . . . [A] Chapter 7 trustee relies on a debtor's books and records as well as bankruptcy filings for information. The Trustee found no copy of any tax document (submitted to the IRS or any other taxing entity) in the Debtor's books and records indicating that "LR cease being a tax flow through taxpayer." But, the Trustee did locate the Debtor's List of Equity Security Holders filed with the Bankruptcy Court. The same was used in connection with the tax filings.

JA757. The Trustee, either directly or through counsel, provided similar

explanations to others as well. JA757.

23.     Notwithstanding these explanations, as well as the Trustee's

established protocol for Masked Tax Return Copies, the Trustee continued to receive

requests/demands related to the K-1's and related tax filings. While the Trustee also

was informed that the ESH List was inaccurate, she was unable to ascertain whether

those assertions were correct based a number of things including but not limited to

other information she saw in the Debtor's books and records. JA758. In the exercise

of her business judgment,  she maintained that it was in the Estate's best interest to

have an order from the Bankruptcy Court authorizing her continued reliance on the

ESH List in connection with her ongoing administration of the Estate. JA762.

24.     On or about November 2, 2021, the Trustee filed her Motion to Authorize.  JA729-750.

25.     Thereafter, Mr. LeClair (and certain others who are listed on the ESH List) objected to the relief sought in the Trustee's Motion to Authorize, JA220-290 (collectively, the "**Tax Motion Objections**").

26.      The Tax Motion Objections were filed notwithstanding the Bankruptcy Case had been pending for over two years wherein Mr. LeClair and others benefitted from numerous actions taken by the Trustee including but not limited to (a) protecting malpractice insurance for former lawyers and payment of certain  associated costs JA692; (b) facilitating client file transfers for former lawyers JA678-684, JA686-691; and (c) providing former lawyers releases from various Estate causes of action. JA770-819. Furthermore, Mr. LeClair filed a claim in the Bankruptcy Case seeking recovery from the Estate for amounts he claimed were allegedly due and owing to him. JA882-890.

27.     The Trustee, directly and through counsel, engaged with one or more individuals, who had filed the Tax Motion Objections in an attempt to resolve said objections.  Through these discussions, the Trustee confirmed that the real issue was whether certain individuals should be relieved of his/her/their tax obligations of the professional limited liability company, one way of which was removal of individuals from the ESH List. As such, the Trustee and said individuals, through counsel,

16

agreed that the underlying issue should be addressed contemporaneously with the

Trustee's Motion to Authorize. Accordingly, the Trustee, through counsel, requested

that the Bankruptcy Court grant, as modified, the procedures to obtain copies of tax

returns and continue all other aspects of the Trustee's Motion to Authorize until

March 29, 2022, with the parties intending that Mr. LeClair's Motion to Amend and

any similar relief would be heard on the same day. JA486-487.

28.    Pursuant to an Order entered on February 23, 2022, the Bankruptcy

Court granted, as modified, the procedures to obtain copies of tax returns and

continued all other aspects of the Trustee's Motion to Authorize until March 29,

2022, JA864-870, with the parties intending that any motion to amend the ESH List

would be heard on the same day. JA487.

29.    On February 14, 2022, Mr. LeClair filed the Motion to Amend.

JA291-413. Thereafter,  certain of the others (but not all) on the ESH List filed

various joinder motions  JA414-425 (collectively, the "**Joinders**" and with Mr.

LeClair's Motion to Amend, the "**Modification Motions**"), seeking relief

substantially similar to that sought in Mr. LeClair's  Motion to Amend and joining

legal arguments and legal citations contained in Mr. LeClair's Motion to Amend.

30.    While the specific request in the Modification Motions was removal

from the ESH List, the ultimate desired outcome was amendment of the Debtor's

2019 and 2020 tax returns such that (a) the Estate will cease issuing K-1s to said

individuals and (b) those individuals will no longer share in the tax benefits, or more importantly, tax obligations of the professional limited liability company from 2019 forward. The crux of the Tax Motion Objections and the Modification Motions was to terminate tax obligations for certain members of the Firm. JA493.

31.    While the Trustee understood the Modification Motions' arguments and was sympathetic to the plight of some former attorneys, she maintained that there was another very logical way to interpret the Company's corporate governance documents consistent with the list of individuals contained on the ESH List (a list that had been filed by the Firm itself); said interpretation was that members of LeClairRyan as of July 29, 2019 (the date the members elected to dissolve the Company) remain equity security holders for tax and other economic purposes until such time as the Company has been dissolved and completely wound-up, regardless of any member's purported withdrawal after July 29, 2019. JA493.

32.    The Trustee, through counsel filed responses to the Modification Motions, (1) reminding all that any requested relief must have no adverse impact on the Estate and (2) respectfully requesting that any relief granted in the Modification Motions should not result in the equivalent of changing the Debtor's tax status from a flow through taxpayer to an entity that is taxed at the corporate level given the actions and inactions of the members before the Petition Date, and the inactions of former attorneys for almost two and a half years after the Petition Date. JA426-476.

18

33. Mr. LeClair filed a Reply ("**GDL Reply**") in support of his Motion to Amend. JA477-484.

On March 29, 2022, the Bankruptcy Court conducted an evidentiary hearing ("**March 29 Hearing**") on the Trustee's Motion to Authorize, Mr. LeClair's Motion to Amend, and the Joinders. JA501-561. At the beginning of the March 29 Hearing, the Trustee, through counsel, stated that she understood that the Tax Motion Objections were being withdrawn but there was a disagreement related to the same. JA502. She further maintained that "pleadings before this [Bankruptcy] Court indicate that their objections to the trustee's tax motion are being withdrawn and/or otherwise resolved once Your Honor rules on their modification motions" JA502 because (1) Mr. LeClair had stated in his Motion to Amend that he did not object to the Trustee's reliance on an accurate ESH list, (2) the others through their Joinders agreed that the Trustee could rely on an accurate ESH List, and (3) the point of the hearing was for the Bankruptcy Court to "rule on what is an accurate ESH List." JA502. Taking Mr. LeClair's theory for removal from the ESH List to conclusion, there would be no one on the list. As such, consistent with what she had constantly maintained, the Trustee objected to relief that would in essence change the Debtor's tax status from a flow through taxpayer to an entity that is taxed at the corporate level.

19

Two courts now have reviewed all facts, interpreted the relevant contract (the Operating Agreement) in light of those facts, rejected Mr. LeClair's arguments, and determined that Mr. LeClair's Motion to Amend should be denied given that the Debtor appropriately included Mr. LeClair on the ESH List. JA1031-1032, JA573-575.

## SUMMARY OF ARGUMENT

Mr. LeClair, a founder and former CEO and Chairman of LeClair Ryan, and its other equity members took a gamble in 2018 by changing the Firm's corporate status from an entity that is taxed at the corporate level to a flow through taxpayer. They did this just over a year before the filing of the Bankruptcy Case in an effort to provide shareholders more take-home money at a time the Firm was clearly insolvent and unable to pay its debts. JA752-753. The Firm's financial condition deteriorated to the point that, on July 29, 2019, the requisite number of members voted to dissolve the Firm, and ultimately the Firm sought bankruptcy protection to further effectuate a wind-down in an orderly fashion. JA661-669. In an attempt to eliminate the risk of potential related tax consequences,  Mr. LeClair desires to be removed from the list of equity members of the Firm filed by the Debtor (the ESH List).

After considering all evidence that had been admitted at the hearing on the Motion to Amend, the District Court, as well as the Bankruptcy Court, correctly

ruled against Mr. LeClair because (1) there was no lawful basis to order amendment to the ESH List, JA1055, (2) LeClairRyan' s Operating Agreement controlled, JA1057-1058, (3) the Dissolution Resolution's adoption conformed to the Operating Agreement, JA1058-1063, (4) LeClairRyan' s effective date of dissolution was July 29, 2019, JA1064-1068, and (5) upon the occurrence of that dissolution event on July 29, 2019, pursuant to Section 5.03 of the Operating Agreement, Mr. LeClair's membership interest in the Firm could not terminate until the Firm has been completely wound up. JA1069-1071. These rulings are sound and should be upheld.

Moreover, this Court should reject Mr. LeClair's attempt to now retry this matter on new assertions of purported facts and incorrect statements of law. Furthermore, this Court should refuse to review only discrete aspects of the Operating Agreement, as Mr. LeClair implores, but instead should construe it as a whole, giving effect to every provision thereof. In so doing, it is clear that (1) the Dissolution Resolution was properly adopted and made effective on July 29, 2019 and (2) Mr. LeClair remained an equity Member even after he terminated his employment with the Firm that had voted to shut its doors. And as such, this Court should affirm the holding of the lower courts that denied Mr. LeClair's Motion to Amend.[2]

---

[2] Mr. LeClair has not questioned in this Honorable Court the lower courts' rulings as it relates to the Trustee's Motion to Authorize.

# ARGUMENT

Regardless of any tax consequence that may ultimately result, Mr. LeClair is properly listed as an equity Member on the Firm's ESH List that the Debtor filed with the Bankruptcy Court before the Trustee was even appointed. In an attempt to litigate this issue for a third time in hopes of eliminating any risk of adverse tax consequences, Mr. LeClair desperately seeks a different result by using information that was not admitted into evidence by the Bankruptcy Court, utilizing new arguments presented to neither the Bankruptcy Court nor the District Court, and imploring this Honorable Court to review aspects of the Operating Agreement in isolation and in such manner that fails to give effect to the meaning of the entire contract. Mr. LeClair certainly should not be allowed to rely on facts not admitted into the trial record and not considered, or available for evidentiary consideration, by the Bankruptcy Court when it rendered its decision. Moreover, this Court should construe the Operating Agreement as a whole, giving effect to every provision thereof. Upon doing the same, it is clear that the Bankruptcy Court and District Court correctly denied the Motion to Amend because (1) Mr. LeClair's equitable interest as a Member of the Firm that had voted to shut its doors and wind-down its operations did not terminate as he left the Firm's employ and (2) the Firm was dissolved while Mr. LeClair was a member.

# I.    Mr. LeClair's Attempts to Retry this Matter on Purported Facts With No Evidentiary Support and/or New Arguments Should be Rejected.

After convincing neither the Bankruptcy Court nor the District Court of his convoluted, self-serving rewrite of the Firm's corporate governance documents, Mr. LeClair comes before this Honorable Court seeking his third bite of the apple by propounding statements that are neither (i) supported by the evidence admitted into the record and considered by the Bankruptcy Court when ruling on Mr. LeClair's Motion to Amend nor (ii) true, based on the actual evidence that was properly before the Bankruptcy Court and thereafter considered by the District Court. The Bankruptcy Court correctly considered the admitted evidence before it and the District Court properly reviewed the evidence of record that had been admitted by the Bankruptcy Court. And, Mr. LeClair's attempt to fabricate facts and propound new arguments should be rejected by this Court.

Documents that were never admitted into evidence by the Bankruptcy Court at the hearing on the Motion to Amend should not be considered by this Court. *Young Design, Inc. v. Teletronics Int'l, Inc.*, 38 F. App'x 994, 998 n.7 (4th Cir. 2002) (Deposition testimony referred to on Mr. LeClair's Brief and not introduced at trial stricken from record.); *EEOC v. United Va. Bank/Seaboard Nat'l*, 555 F.2d 403, 405 n.5 (4th Cir. 1977) (Tables and charts identified in Brief Appendix but never introduced at trial or submitted to the trial court not considered by court on appeal);

*see also In re Comput. Dynamics, Inc.*, 253 B.R. 693, 697 (E.D. Va. 2000) *aff'd*, 10 Fed. Appx. 141 (4th Cir. 2001) ("The district court may only consider that evidence presented to the bankruptcy court and made part of the record."). Principally, "facts relating to the merits of the case will be decided on the basis of evidence admitted into the trial record." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 142 (1st Cir. 1985), *cert. denied*, 476 U.S. 1172 (1986). This is because "each litigant should be given a fair opportunity to rebut and put into perspective the evidence admitted against its position." *Nantucket Inv'rs II v. Cal. Fed. Bank (In re Indian Palms Assocs.)*, 61 F.3d 197, 205 (3d Cir. 1995).

The primary premise of Mr. LeClair's Brief before this Honorable Court is that "[t]he Firm's resignation-and-redeem rule was well understood." Appellant's Brief p.8. Mr. LeClair further contends that neither the District Court nor the Bankruptcy Court applied the rule as intended. Appellant's Brief p.23. Mr. LeClair makes this bold proclamation about the resignation-and-redeem rule notwithstanding there was absolutely no evidence presented at trial to support said statement. The document referenced for support, JA289-290,[3] was never even offered for admission into evidence until after the Bankruptcy Court had issued its

---

[3] The document was attached as part of a limited response filed to the Trustee's Motion to Authorize. JA 273-290. It is an exhibit to Exhibit A of that limited response. It was never admitted into evidence.  JA 560.

oral ruling. JA560. As such, the Bankruptcy Court denied its admission because there was no opportunity for any cross-examination. JA560. The Bankruptcy Court did specifically invite anyone to "resubmit that and ask for a separate ruling." JA560. No one accepted the Bankruptcy Court's invitation; instead, Mr. LeClair furtively seeks to have this Court act as if had been admitted into evidence.[4]

This Court should reject Mr. LeClair's tactics especially given that the evidence that was admitted at trial establishes a picture very different than the one Mr. LeClair attempts to convey. Specifically, as LeClairRyan faced extreme financial distress and attorneys were exiting the Firm, there was confusion over resignation items. JA489-490. The fact that the Firm's resignation-and-redeem rule was not understood, contrary to what Mr. LeClair would have this Court believe with absolutely no evidence to support, was further illustrated during the hearing on the Motion to Amend by counsel for eleven individuals (including the Firm's CEO, Charles Gustafson, and President, Elizabeth Acee, in July of 2019) on the ESH List; said counsel articulated a very different rule from the one that Mr. LeClair claims

---

[4] In sharp contrast, every Declaration (and exhibits attached thereto) of Lynn L. Tavenner, Chapter 7 Trustee, contained in the Joint Appendix (JA485-494, JA713-725, JA751-763, JA832-841, JA860-863) was properly admitted into evidence by the Bankruptcy Court (see JA499, JA500, JA151, JA180-181, JA186) and was made part of the record as admitted evidence (as opposed to a mere document that was filed on a court's docket and never admitted into evidence). Furthermore, the referenced declaration of Lori D. Thompson, Esquire, was admitted into evidence in connection with proceedings in the Case. JA73. Additional documents used to support the Trustee's position were also accepted into evidence. JA499-500.

was well understood.  JA534-537, JA545-546 (stating among other things "Section 2.02A does  not contemplate a deemed sale upon the termination of the member's employment as Mr. LeClair suggests.")

This Court should also reject any argument presented in Mr. LeClair's Brief that was not raised below. *Levy v. Kindred*, 854 F.2d 682, 685 (4th Cir. 1988)("[a]n appellate court will not consider an issue raised for the first time on appeal."); *see also In re Computer Dynamics, Inc.*, 253 B.R. 693, 697 (E.D. Va. 2000) *aff'd*, 10 Fed. Appx. 141 (4th Cir. 2001) ("The district court may only consider that evidence presented to the bankruptcy court and made part of the record.").

## II.    The District Court and the Bankruptcy Court Correctly Considered, Construed, and Harmonized Provisions of the Operating Agreement in Denying Mr. LeClair's Motion to Amend.

Not only does Mr. LeClair attempt to create a false narrative around the resignation-and-redeem rule, but he also seeks to have this Court interpret discrete aspects of the Operating Agreement and ignore other critical components. Mr. LeClair's approach is contrary to the core of contract interpretation in Virginia.[5] *Levine v. Emplrs Ins. Comp. of Wausau*, 887 F.3d 623, 627 (4th Cir. 2018) ("[E]ach phrase and clause of a [] contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be

_____

[5] It is undisputed that the Operating Agreement is governed by the laws of Virginia.

reasonably done, so as to effectuate the intention of the parties as expressed therein.") (quoting *TravCo Ins. Co. v. Ward*, 284 Va. 547, 552 (2012)). This Honorable Court has recognized the import of construing clauses of a contract together. *IMWA Equities IX Co. v. WBC Assocs. Ltd. P'ship*, 961 F.2d 480, 483 (4th Cir. 1992) ("The contract is to be construed as a whole, and effect given to every provision thereof if possible.").

When construing the Operating Agreement as a whole, as the District Court did, it is clear that neither the Bankruptcy Court nor the District Court erred in concluding that (A) Mr. LeClair remained an equity Member of the entity even after terminating his employment as a lawyer in a law firm that was no longer going to exist and (B) the Firm was dissolved while Mr. LeClair was a Member.

## A.    Mr. LeClair Remained an Equity Member of the Shuttering Firm Even After He Left its Employ.

Mr. LeClair asks this Court to determine his equitable interest as a Member of the Firm terminated as he left its employ notwithstanding that the Firm had voted to shut its doors. In so doing, Mr. LeClair basically asks this Court to ignore every aspect of the Operating Agreement other than Section 2.02. As artfully explained by the District Court "[w]hile Section 2.02 governs termination of membership in conjunction with termination of employment, context also matters, and whether termination could occur post-dissolution turns instead on interpretation of Section

5.03." JA1070. The District Court considered Section 2.02 at length, JA1068-1072, but correctly considered all other aspects of the Operating Agreement as well in light of the facts. And contrary to Mr. LeClair's claim that the District Court made up a new rule, the District Court applied the rule that is contained in the Operating Agreement to a Firm that was shutting down and requiring all attorneys to seek new employment. As the District Court aptly stated: "All of the Appellants' employment terminated by September 2019, a necessity because the Firm no longer existed post-dissolution except for wind-up purposes, and LeClair Ryan attorneys could not continue to practice law at the Firm following July 29, 2019." JA1069-1070. And the District Court correctly noted: "Following an event of dissolution, the Court must also consider Section 5.03 of the Operating Agreement . . . . ." JA1070.

Section 5.03 of the Operating Agreement reads:

> Section 5.03 No Withdrawal. A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in the PLLC Act. So long as a Member continues to hold any Shares, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company **and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void and of no force or effect**. As soon as any Person who is a Member ceases to hold any Shares, such Person shall no longer be a Member.

JA483 (emphasis added).

Likely recognizing that Section 5.03 destroys his self-serving interpretation of the Firm's corporate governance documents, Mr. LeClair for the first time on appeal fabricates a new twist for Section 5.03 and proclaims that said section is only applicable in connection with "disassociation" of members.  Appellant's Brief p.30-32. Mr. LeClair's argument should be rejected by this Court because not only is this new spin raised for the first time on appeal, *Levy*, 854 F.2d at 685, but it is also wrong. "Under Virginia law, courts adhere to the 'plain meaning' rule in interpreting and enforcing a contract." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). As the District Court correctly noted "the operative section" is "Such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation . . . shall be null and void and of no force and effect." JA1071.

Furthermore, while labels are not controlling, they can be helpful in determining contractual intent. *Commonwealth, Dep't of Highways & Transp.  v. E. W. Yeatts, Inc.*, 233 Va. 17, 24, 353 S.E.2d 717, 721 (1987); *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 180, 519 S.E.2d 133, 138 (1999). In this instance, the label for Section 5.03 of the Operating Agreement is "No Withdrawal" implying the intent is to address circumstances when withdrawal is not applicable.  Disassociation of a Member (i.e. - the 'Bankruptcy of such Member") is but one circumstance addressed in Section 5.03. Similarly, in addressing when withdrawal does not apply,

Section 5.03 also examines dissolution of the Firm and, under said circumstances, specifically prohibits a Member from withdrawing (i.e., No Withdrawal as the title of the Section states). The Operating Agreement makes it clear that under those circumstances "prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void and of no force or effect." JA1071.

Thus, the District Court properly concluded "[a]s dissolution had occurred, but the winding up of the Firm had not yet been completed" JA1070, Mr. LeClair was not able to "withdraw or resign from Membership of the Firm . . . . ." JA1070.

This interpretation is consistent with public policy, yet another reason to reject Mr. LeClair's attempted rewrite. Restatement (Second) of Contracts § 207 (Am. Law Inst. 2019) ("In choosing the meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.").  As aptly stated at the hearing on the Motion to Amend by counsel for  the  Firm's CEO, Charles Gustafson, and President, Elizabeth Acee, in July of 2019, "If you were to follow Mr. LeClair's legal theory through to the end, in all of his analysis, there would be no members left.  And the ESH list would have no one listed upon it  That cannot possibly be right.  That would not be equitable . . . ." JA537.

**B.    The Firm Was Dissolved While Mr. LeClair was a Member.**

Notwithstanding Mr. LeClair's additional attempts to rewrite the Operating Agreement to fit his personal tax needs, LeClair Ryan was dissolved while Mr. LeClair was a Member as correctly determined by both the Bankruptcy Court and the District Court. To support his convoluted position, Mr. LeClair claims that both the Bankruptcy Court and the District Court "misapplied that nonexistent exception." Appellant's Brief p.33.  As explained above, the exception was real; and it was properly applied when looking at an unambiguous contract with plain meaning

As both the Bankruptcy Court and the District Court correctly explained, JA567-569; JA1064-1068, the operative provisions of the Operating Agreement are Sections 11.01 and 11.02, with the former providing that "[t]he Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events: (a) [a]n election to dissolve the Company made by holders of a majority of the Common Shares." JA385. Section 11.02 of the Operating Agreement clearly provides that "Dissolution of the Company shall be effective **on the day on which the event described in Section 11.01 occurs** . . ." JA385 (emphasis added). Given that it was undisputed that the holders of a majority of the Firm's common stock voted on July 29, 2019, the lower courts correctly found that dissolution occurred on July 29, 2019. This is the proper interpretation when looking at an unambiguous contract with plain meaning. *Bridgestone/Firestone,*

*Inc. v. Prince William Square Assocs.*, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995).

Mr. LeClair again tries to change the plain meaning of the four corners of the document by emphasizing that the Dissolution Committee had the ability to take additional action after July 29, 2019. The actions of the Dissolution Committee are irrelevant under Section 11.02 as it relates to an Event of Dissolution. The Event of Dissolution is triggered "on the day" there is an "election to dissolve the Company made by holders of the majority of the Common Shares." Furthermore, in trying to convince this Court of his self-serving interpretation of the Operating Agreement, Mr. LeClair asks this Court to ignore the plain language of the Operating Agreement and instead focus on two events that occurred after July 29, 2019 – the filing of the Bankruptcy Case and a sworn statement by the Trustee – which events Mr. LeClair inaccurately maintains support his interpretation. As if the request is not egregious enough, Mr. LeClair implies a false narrative to those events.

Mr. LeClair suggests to this Court that the Firm filed the Chapter 11 Bankruptcy Case in lieu of dissolving. Appellant's Brief p.34-35. The Court should reject this argument for numerous reasons. First, it is raised for the first time on appeal, probably because the Bankruptcy Court, who was intimately familiar with the Chapter 11 Bankruptcy Case, likely would not have reacted positively to such a frivolous position. Regardless of the reason for this untimely argument being raised

for the first time on this appeal, it should be rejected. *Levy*, 854 F.2d at 685. It should also be rejected because there is no evidentiary support for the same. *In re Computer Dynamics, Inc.*, 253 B.R. at 697. And not only is there no evidentiary support for the same, but Mr. LeClair also knows that it is a false statement. While some bankruptcy cases are filed with the intent to remain in business and reorganize, the same was never the intent with the filing of the LeClairRyan's Bankruptcy Case. On the same day that it filed for Chapter 11 relief, LeClair Ryan filed with the Bankruptcy Court *a Declaration of Lori D. Thompson, Esq. in Support of Chapter 11 Petition and First Day Motions.* JA661-677. In that declaration, Ms. Thompson makes it abundantly clear that the Bankruptcy Case was filed to effectuate the wind-down with statements such as (1) "I will continue to provide management services, when needed, to LeClairRyan as part of its wind down" JA661; (2) "Filing and relief requested on the first day was necessary and essential to the Debtor's orderly wind-down . . ." JA662; and (3) "As of the commencement of the case, LeClairRyan employs less than 10 people to assist with the wind-down. All such employees are critical to the wind-down" JA664. In that seventeen page Thompson declaration, wind-down/wind down is used forty-five times. Mr. LeClair is well aware that the Chapter 11 filing was the mechanism to wind down the Firm and to suggest that it was anything else is preposterous and should not be tolerated by this Court.

Similarly, Mr. LeClair, for the first time on appeal, claims that the Trustee's own actions demonstrate that the Firm was not dissolved on July 29, 2019. Directing the Court to the Trustee's sworn statement that concluded "until such time as the Company has been dissolved and completely wound up, regardless of any member's purported withdrawal after July 29, 2019," JA488, Mr. LeClair intimates that the Trustee has conceded that the Firm was not dissolved on July 29, 2019. Appellant's Brief p.35. This Court certainly should recognize that Mr. LeClair is playing games. The Trustee's use of the conjunctive "and" requires that both conditions be met. *And* Oxford English Dictionary (2020). The Firm's dissolution occurred on July 29, 2019 but the "wound up" has not yet been finalized. The Trustee's statement is correct and consistent with the holdings of the Bankruptcy Court and District Court. Dissolution has occurred; the complete wind up has not.

Recognizing that his arguments related to these two actions subsequent to July 29, 2019 are complete losers, Mr. LeClair also asks this Court to yet again ignore all other aspect of the Operating Agreement, read only Section 9.08(i), and determine that dissolution could only occur upon his written consent or affirmative vote. Appellant Brief p.37-40. The District Court properly rejected this argument and provided a detail explanation as to why the Operating Agreement required neither his vote nor consent to adopt the resolution." JA1058. Considering Sections 1.01(xx), 2.02 (h) , and 9.08(d), (f), (g) and (i) of the Operating Agreement (and as

34

further supported by its Preamble), the District Court determined "together, these provisions, along with Section 9.08(g), demonstrate that once the Firm received notice from a Member, that Member could not participate in Firm democracy." JA1060.

Section 9.08 (g) states:

provided, however, if notice of the termination of a Member's employment with the Company has been given by the Member or the Company prior to the date of such meeting, such Member shall not be included in determining the presence of a quorum and shall not be entitled to vote at such meeting.

JA708. The undisputed evidence before the lower courts was: (1) Mr. LeClair provided a notice of termination of employment on July 26, 2019, JA432, and (2) the dissolution vote was taken on July 29, 2019. Construing each and every clause of the Operating Agreement together, the District Court aptly "read Section 9.08(i) as requiring the vote of the majority of then outstanding Preferred shares *entitled to vote*; it cannot be that LeClair lacked the ability to vote under every other provision but was required to vote under only this provision." JA1062.

If this Court were to determine that Mr. LeClair's written consent was required, it can still affirm the lower courts' denial of Mr. LeClair's Motion to Amend because the Bankruptcy Court properly found that Mr. LeClair ratified the Dissolution Resolution through (i) the July 26, 2019 email and (ii) his conduct in the Bankruptcy Case of (a) accepting benefits of the Bankruptcy Case and (b) by, among

other things, his admissions in the Motion to Amend conceding that the Bankruptcy Court has jurisdiction, that the Motion to Amend is a core proceeding, and the statutory predicates for the relief. This is proper under this Court holding in *Hager v. Gibson*, 108 F.3d 35, 40 (4th Cir. 1997) ("[O]ne may ratify an unauthorized act by 'accepting its benefits with full knowledge of the relevant facts, or, if upon learning of the act, he fails to promptly disavow it.'" *Id.* (quoting *Kilby v. Pickurel*, 240 Va. 271, 275, 396 S.E.2d 666, 668-69 (1990)).

Mr. LeClair's attempt to imply that the filing of the Bankruptcy Case was the equivalent of the dissolution trigger contained in the Dissolution Resolution is farfetched and should be rejected. The Dissolution Resolution does not mention bankruptcy. The Dissolution Resolution appointed a Dissolution Committee, JA266, made that Dissolution Committee the "Liquidator" as contemplated by Section 11.03 of the Operating Agreement, JA266, and provided broad range of authority/power to effectuate an orderly wind-down of the Firm.  The filing of the Bankruptcy Case resulted during that wind-down because, as Ms. Thompson stated in her declaration, the Firm's secured lender would not allow the wind-down to continue outside of the bankruptcy arena. JA669 (purpose of the bankruptcy filing was "to conduct an orderly wind down for the benefit of all creditors and parties in interest, including clients represented by the firm."). The filing of the Bankruptcy Case was not the trigger of dissolution; it was the mechanism for an orderly winddown following the

36

dissolution event on July 29, 2019 that the Firm was forced to utilize by its secured lender.

## CONCLUSION

While the Trustee is sympathetic to Mr. LeClair's plight, both his dispute with the Trustee and his plea to this Honorable Court is misplaced. Before filing for bankruptcy protection on September 3, 2019 to continue its orderly wind-down, the Firm had the ability to change its corporate structure from a flow through taxpayer to an entity that is taxed at the corporate level. For whatever reason, it did not. Mr. LeClair now attempts to correct the consequence of the Firm's inaction with a convoluted, self-serving rewrite of the Firm's corporate governance documents. Those same documents were thoroughly reviewed and analyzed below, and Mr. LeClair's ever evolving requested rewrites were rejected by the Bankruptcy Court and the District Court. And with that knowledge and understanding, the Trustee respectfully requests that this Honorable Court affirm the rulings of the lower courts that denied Mr. LeClair's Motion to Amend. Regardless of the potential tax consequences, removing Mr. LeClair from the ESH List is warranted by neither the facts of this Case nor the law related to the same.

Respectfully submitted,

LYNN L. TAVENNER, CHAPTER 7
TRUSTEE

Dated: September 29, 2023     By: */s/        Paula S. Beran*
Richmond, Virginia            Paula Steinhilber Beran, Esquire (VSB No. 34679)
                              PBeran@TB-LawFirm.com
                              Tavenner & Beran, PLC
                              20 North 8th Street
                              Richmond, Virginia 23219
                              Telephone: (804) 783-8300
                              Email: pberan@tb-lawfirm.com
                                  *Counsel for Lynn L. Tavenner,*
                                  *Chapter 7 Trustee/Appellee*

## CERTIFICATE OF COMPLIANCE

1.    The foregoing brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2.    Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, the foregoing brief contains 9,073 words.

3.    I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief with the word or line printout.


*/s/    Paula S. Beran*
Paula Steinhilber Beran, Esquire
*Counsel for Lynn L. Tavenner,*
*Chapter 7 Trustee/Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 29, 2023, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will

send notice of the filing to the following counsel of record:

> Monica T. Monday (VSB No. 33461)
> Andrew M. Bowman (VSB No. 86754)
> David R. Berry (VSB No. 90554)
> GENTRY LOCKE
> P.O. Box 40013
> Roanoke, Virginia 24022-0013
> Telephone: (540) 983-9300
> Facsimile: (540) 983-9400
> Email: monday@gentrylocke.com
> Email: bowman@gentrylocke.com
> Email: berry@gentrylocke.com
> *Counsel for Appellant, Gary D. LeClair*

I also certify that I served a copy on the Office of the United States Trustee.


*/s/     Paula S. Beran*
Paula Steinhilber Beran, Esquire
*Counsel for Lynn L. Tavenner,*
*Chapter 7 Trustee/Appellee*