**CASE NO. 23-1131(L)**

# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

_____

GARY D. LECLAIR,

*Appellant,*

v.

LYNN TAVENNER,

*Appellee, Trustee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

_____

**REPLY BRIEF OF APPELLANT**

_____

Monica Taylor Monday
Andrew M. Bowman
David R. Berry
GENTRY LOCKE
P. O. Box 40013
Roanoke, VA 24022-0013
540-983-9300

*Counsel for Appellant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

CLARIFIED STATEMENT OF THE CASE ........................................ 2

ARGUMENT ...................................................................................... 4

   I.   The Operating Agreement did not contain any post-dissolution
       "exception" to "Section 2.02's blanket resignation-and-redeem rule" .......... 5

      a.  Section 2.02 cannot be severed from the Operating Agreement ............... 6

      b.  Section 5.03 does not "destroy" Section 2.02 ........................................... 7

      c.  Section 5.03's heading is consistent with the text ................................... 10

      d.  The Trustee's "public policy" argument undermines
          her interpretation ...................................................................................... 12

  II.  If there was a "post-dissolution" exception, it would not affect
       the outcome because the Firm did not dissolve while LeClair
       was a Member ............................................................................................ 15

      a.  The Firm pursued Chapter 11 bankruptcy in lieu of
          state-law dissolution .............................................................................. 15

      b.  The Firm was not dissolved on July 29, 2019 ........................................ 18

      c.  The Firm could not have dissolved before LeClair left ........................... 20

         i.  Dissolution required LeClair's "written consent or affirmative
            vote," but he never gave either ........................................................ 20

         ii.  LeClair never "ratified" the Firm's purported dissolution ................. 23

  III.  The Trustee cannot bypass the merits by mischaracterizing
        LeClair's arguments as "new" ................................................................... 24

CONCLUSION ...................................................................................................26

CERTIFICATE OF COMPLIANCE ...................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Ames v. Am. Nat. Bank*,
163 Va. 1 (1934) .......................................................................13

*Bentley Funding Grp., L.L.C. v. SK&R Grp. L.L.C.*,
269 Va. 315 (2005) ....................................................................13

*De Simone v. VSL Pharm., Inc.*,
36 F.4th 51 (4th Cir. 2022) .......................................................26

*Helvering v. Gregory*,
69 F.2d 809 (2d Cir. 1934).........................................................14

*IMWA Equities IX Co. v. WBC Assocs. Ltd. P'ship*,
961 F.2d 480 (4th Cir. 1992) ...........................................5, 8, 10

*United States v. Ismail*,
97 F.3d 50 (4th Cir. 1996) .........................................................14

**Statutes**

Va. Code § 13.1-1001.1 ........................................................ 12-13

Va. Code § 13.1-1003 ..................................................................12

Va. Code § 13.1-1011.1 ...............................................................12

Va. Code § 13.1-1014 ..................................................................12

Va. Code § 13.1-1014.1 ...............................................................12

11 U.S.C. § 101 ......................................................................9, 26

**Rules**

Fed. R. Bank. P. 1007 ...................................................................9

## **INTRODUCTION**

The core question before the Court is whether LeClair should be removed from his former Firm's list of equity security holders ("ESH List"). This is a legal question, which hinges on the Firm's Operating Agreement and the undisputed facts. They lead to one answer: "yes," LeClair must be removed from the ESH List.

The Firm's Operating Agreement was clear that *only* attorneys who were employed by the Firm could hold equity in (or "Shares" of) the Firm. JA346, §2.04. The Operating Agreement was equally clear that those who held Shares – and *only* those who held Shares – were "Members" of the Firm. JA364, §5.03. The Firm consequently redeemed departing Members' Shares on their last day of employment, JA339, §2.02, at which point they were no longer Members. JA364, §5.03.

The Operating Agreement makes for a simple case here because there is no dispute that LeClair's employment ended on July 31, 2019. JA314. That is when the Firm redeemed his Shares, JA339, §2.02, and that is when he ceased to be a Member. JA364, §5.03. Because it occurred before the Firm petitioned for bankruptcy on September 3, 2019, JA203-206, LeClair must be removed from the ESH List.

The Trustee complicates and distorts the inquiry by invoking a nonexistent "exception" based on a "dissolution" that never occurred. Her arguments overlook the flaws in her exception-based-on-dissolution legal theory. This reply revisits those flaws and why they require reversal of the judgment below.

1

## CLARIFIED STATEMENT OF THE CASE

LeClair previously provided a detailed overview of this case. OB 2-21.[1] He stands by every word. There are, however, inaccuracies in the Trustee's "Statement of the Case" that require clarification and correction. RB 1-20.

*First*, the Trustee's "Statement of the Case" does *not* reflect "the undisputed evidence." *Contra id*. at 3. Much of what she says is based on speculation, what she "understands," or after-the-fact hearsay. *See id.* at 3-20.[2] Indeed, the Trustee divorces herself from the events that occurred prior to her appointment on October 6, 2019. *Id*. at 4. That is because the Trustee was not there; she has no firsthand knowledge of what occurred. Neither does LeClair.

*Second*, although he was a Member of the Firm until July 2019, LeClair had not been involved in its leadership or management for many years. JA311. He founded and leant his name to the Firm in 1988 and, over the next two decades, served as CEO and Chair of the Board – during which time the Firm enjoyed financial success. JA311; JA891-893. In 2007, however, LeClair began transitioning out of management. JA899. He stepped down as CEO in June 2011 – more than eight years before the filing of bankruptcy – and returned to the active practice of

---

[1] Citations to LeClair's opening brief and the Trustee's response brief are abbreviated as "OB __" and "RB __," respectively.

[2] The Trustee's use of harsh rhetoric is no substitute for legal reasoning. Once again, JA1008, LeClair refrains from responding in-kind.

law. JA311. LeClair no longer had any management authority, signatory authority, and he could not direct the Firm's operations. JA311; JA899. Then, in January 2016, LeClair's final term on the Board ended, and his sole role at the Firm was practicing law. JA311; JA892-893. LeClair nevertheless remained one of the Firm's greatest supporters – he voluntarily reduced his salary and allowed the Firm to tap his retirement savings to fund budget shortfalls – long after his leadership role ended. JA892.

*Third*, the issues presented are legal questions and should not be determined by these background matters. While LeClair recognizes and appreciates the Trustee's efforts in the bankruptcy proceeding, this appeal is not about accounting methodologies, audits, tax returns, or personal attacks. *Contra* RB 4-15. This appeal also is not about the propriety of the Trustee's allocation of millions in taxable income to former Members without making any cash distributions to cover their resulting tax liabilities. *Contra id*. at 20. The issues presented concern one thing: the legal effect of the Firm's Operating Agreement. OB 2.

*Fourth*, there are – at most – six relevant facts, and they are all undisputed:

1) On July 26, 2019, the Firm waived its notice period and "candidly wanted" its lawyers to immediately resign and terminate their employment (JA398-403, JA406);

2) On July 26, 2019, LeClair tendered his resignation (JA313, JA408);

3) On July 29, 2019, some of the Firm's Members approved the July Resolutions, which contemplated a dissolution "to

3

be effective as of such date as the [newly-appointed] Dissolution Committee shall determine" (JA266-270);

4)      On July 29, 2019, LeClair held more than 50% of the Firm's then outstanding Preferred Shares (JA518);

5)      LeClair did not give his written consent or affirmative vote on any of the matters addressed in the July Resolutions (JA518-519);

6)      On July 31, 2019, LeClair's employment with the Firm ended (JA314);

The first five facts bear on whether the Firm was dissolved. Their relevance depends on whether the Operating Agreement contained a post-dissolution "exception." If it did not, or if the Firm was not dissolved, the sixth undisputed fact is dispositive.

## ARGUMENT

The Trustee does not meaningfully address the issues presented on appeal. She simply restates the Bankruptcy and District Courts' interpretations of the Operating Agreement, and proclaims their rulings were correct. *See* RB 27-30. In doing so, the Trustee overlooks the interpretive flaws that led to those rulings.

The Trustee's legal theory consists of two sequential arguments. *First*, she argues the Operating Agreement contained an "exception" that prevented the Firm from redeeming Shares following dissolution. *Id*. at 26-30. *Second*, she argues the Firm "dissolved" before LeClair's employment ended. *Id*. at 30-36. Based on these arguments, the Trustee insists LeClair remains a Member of the Firm. *Id*. at 37. To prevail on appeal, however, she must succeed on *both* arguments.

4

*Neither* has merit. The Trustee's first argument fails because the Firm's "resignation-and-redeem rule" is dispositive; there were no exceptions, before or after dissolution, and it does not matter whether the Firm dissolved. Her second argument also fails because the Firm did not – and could not – dissolve before LeClair's employment ended. Each argument fails on its own merits, and either failure leads to the same outcome: LeClair must be removed from the ESH List.

LeClair does not belong on the ESH List because the Firm redeemed his Shares and he was not a Member once his employment ended on July 31, 2019. There was no post-dissolution exception and, regardless, there was no dissolution. The Court should reverse the judgment and remand the case for LeClair to be removed from the correctly-dated ESH List. *See* JA1032.

## I.    The Operating Agreement did not contain any post-dissolution "exception" to "Section 2.02's blanket resignation-and-redeem rule."

Both parties agree that the Operating Agreement "is to be construed as a whole, and *effect given to every provision thereof if possible*." OB 24; RB 27 (both quoting *IMWA Equities IX Co. v. WBC Assocs. Ltd. P'ship*, 961 F.2d 480, 483 (4th Cir. 1992)). Here, that means reading two parts of the Operating Agreement together. The first is Section 2.02, which required the Firm to redeem the Shares held by a departing Member "immediately prior to the termination of his or her employment." JA339, §2.02(a); *see* JA341, §2.02(b)(iii); JA344, §2.02(g). The second is Section

5.03, which stated: "As soon as any Person who is a Member ceases to hold any Shares, such Person shall no longer be a Member." JA364, §5.03.

### a. *Section 2.02 cannot be severed from the Operating Agreement.*

The Trustee barely mentions Section 2.02. RB 27-30. She does not cite it or quote it. *Id*. Her sole argument about it is that "[t]he District Court considered Section 2.02 at length." *Id*. The issue, however, is not whether the court "considered" Section 2.02. The issue is that there was no "exception" to Section 2.02. OB 27-29.

The District Court certainly "considered" Section 2.02. JA1068-1069. It recognized that "when a Member left the Firm, on the last day of employment, their shares were deemed transferred back to [the Firm]." JA1069. It also understood "the general rule under the Operating Agreement [was] that Membership cease[d] on the last day of employment of the Member at the Firm." JA1069. The court described this as "Section 2.02's blanket resignation-and-redeem rule."[3]

The problem came later when, after recognizing the significance of Section 2.02, the District Court created an "exception" based on Section 5.03. JA1070. Neither Section 5.03 nor any other provision of the Operating Agreement contained an exception to "Section 2.02's blanket-resignation-and-redeem rule." OB 27-29.

---

[3] These were the District Court's words, JA1070, not LeClair's. OB 23-33 (quoting District Court). It is unclear why the Trustee attributes them to LeClair, *see* RB 23-26, and it is unclear why she thinks the District Court misunderstood them. *Id*. at 25 ("[T]he Firm's resignation-and-redeem rule was not understood.").

Nor could they. Section 2.02 and its neighboring provisions "constitute[d] *the exclusive mechanism* for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09. That "exclusive mechanism" cannot be severed from the Operating Agreement. It is critically important to the core question of whether LeClair's Shares were redeemed when his employment ended on July 31, 2019. The answer to that question is that they were redeemed.

**b. *Section 5.03 does not "destroy" Section 2.02*.**

Section 5.03 did not, as the Trustee implies, "destroy" the "exclusive mechanism" in Section 2.02. *See* RB 29. Her argument to that effect is based on part of one sentence in Section 5.03, which she emphasizes as follows:

> Section 5.03 No Withdrawal. A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in the PLLC Act. So long as a Member continues to hold any Shares, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company **and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void and of no force or effect.** As soon as any Person who is a Member ceases to hold any Shares, such Person shall no longer be a Member.

*Id*. at 28 (emphasis added by Trustee). Focusing only on the bolded language, the Trustee claims a different redemption rule – contrary to the "exclusive mechanism" in Section 2.02 – applied "[f]ollowing an event of dissolution." *Id*. at 28-29. The Trustee's interpretation is incorrect.

7

LeClair has explained why the Trustee is mistaken. *See* OB 21-33. She relies exclusively on a fragment of one sentence in a single section within one article of the twelve-article Operating Agreement. That is five levels away from viewing the Operating Agreement as a whole, *IMWA Equities*, 961 F.2d at 483, and each level contradicts the Trustee's interpretation.

*First*, the sentence fragment did not address what happened "following an event of dissolution." RB 28 (quoting District Court). The fragment limited Member withdrawal "*prior*" to dissolution. JA364. This means the fragment was operative for the entirety of the Firm's existence – "prior to dissolution or winding up" – not just "following an event of dissolution." *See* OB 28-29.

*Second*, the fragmented sentence started with an important qualifier: "***So long as a Member continues to hold any Shares***, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company . . . ." JA364, §5.03. The Trustee overlooks this. *See* RB 20-37. She pretends there was no predicate clause:

> "Such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation . . . shall be null and void and of no force and effect." JA1071.

*Id*. at 29 (quoting District Court). "Such" did not start with a capital "S" because the second sentence of Section 5.03 began with "So long as a Member continues to hold

any Shares." JA364. Similar to how the District Court wrote-out that predicate clause, JA1071, the Trustee now writes-off the rest of the Operating Agreement.[4]

*Third*, Section 5.03 contained three sentences, not one, and those three sentences linked the Firm's membership to those who held Shares. *See* OB 29-32. The first sentence opted-out of statutory events of dissociation. *Id*. at 30. The second sentence (including the predicate *and* fragment) prevented anyone from withdrawing as a Member "[s]o long as" they "continue[d] to hold any Shares." *Id*. at 31. The third sentence prohibited any Member, including LeClair, from remaining a Member "[*a*]*s soon as*" he "*cease*[*d*] *to hold any Shares*." *Id*. at 31-32. The Trustee does not dispute this. *See* RB 28.

*Fourth*, Article V governed the "admission" *and* "withdrawal" of Members, both of which hinged, again, on the ownership of "Shares." JA364. Section 5.01 allowed "new" Members to be admitted in one of two ways: "(i) in connection with an issuance of Shares" or "(ii) in connection with a Transfer of Shares." JA364. Then, Section 5.03 prohibited admitted Members – i.e., those who held Shares –

---

[4] The core question is whether LeClair "continue[d] to hold any Shares" after his employment ended. Because Section 5.03 prohibited Members from withdrawing "[s]o long as [they] continue[d] to hold any Shares," JA364, excising that predicate clause would simply expand the prohibition against Member withdrawal (regardless of who "continue[d] to hold any Shares"). This would *not* create an exception to Section 2.02's "resignation-and-redeem rule." Nor would it affect the outcome of this case because, regardless of whether LeClair could withdraw "as a Member," the ESH List may only include those who held Shares when the Firm petitioned for bankruptcy. *See* Fed. R. Bank. P. 1007(a)(3); 11 U.S.C. § 101(16)-(17).

from withdrawing "as a Member" until they "cease[d] to hold any Shares." JA364. Importantly, however, Article V did not address *how* a person could acquire or dispose of Shares. It only addressed the membership consequences of holding or not holding Shares. *See* OB 26-33.

The *fifth* level captures the entire Operating Agreement, and only then can it be "construed as a whole." *IMWA Equities*, 961 F.2d at 483. This perspective confirms that Section 2.02 and its neighboring provisions – *not* Section 5.03 – "constitute[d] *the exclusive mechanism* for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09. Section 2.02 was therefore determinative of whether a person could become or remain a "Member" because Section 2.02 dictated how a person could acquire or redeem Shares. Put simply: Section 5.03 was dependent on – *not* an "exception" to – Section 2.02. *See* OB 25-33.

At every level, the plain language of the Operating Agreement forecloses the Trustee's reliance on any purported "exception" to "Section 2.02's blanket resignation-and-redeem rule." *See* RB 27-30. It had no exceptions. Section 5.03 was derivative of, and perfectly consistent with, the "exclusive mechanism for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09.

**c. *Section 5.03's heading is consistent with the text.***

The Trustee's reliance on the heading of Section 5.03 – "No Withdrawal" – does not support her competing interpretation. *See* RB 29-30. No one disputes there

could be "No Withdrawal . . . *So long as a Member continue*[*d*] *to hold any Shares*." JA364. That is exactly what LeClair and the Operating Agreement have said all along. *See* OB 25-33. It was true any time "*prior* to the dissolution *and* winding up of the [Firm]," JA364, and it remains true today.

The notion of Member "Withdrawal," in and of itself, is a bit of a fiction. Membership was not a choice; holding Shares was the only choice. Those who "continue[d] to hold any Shares" could not "withdraw or resign *as a Member*," but "[a]s soon as any Person who [was] a Member cease[d] to hold any Shares, such Person [was] no longer [] a Member." JA364, §5.03. This meant that if a Member wanted to "no longer be a Member," the only way to make the transition was by "ceas[ing] to hold any Shares." JA364, §5.03. There was no option for "Withdrawal" in the abstract, only an "exclusive mechanism for the redemption, repurchase or acquisition of the Equity of a Member." JA354, §2.09.

There was, however, a definition for "Withdrawing Member": "a Member who voluntarily terminates his or her employment with the Firm." JA338, §1.01(vvvv). Any Member who terminated his or her employment, including LeClair, became a "Withdrawing Member" because the termination of employment triggered Section 2.02's "blanket resignation-and-redeem rule." Otherwise, not even the Firm's CEO had the "authority" to "change" anyone's "status" as a Member

11

"while [they] remain[ed] at the firm," as he said in his Firm-wide email on July 26, 2019:

> 6. I do not have authority to accept anyone's requested change in status or to change their compensation while you remain at the firm.

JA406. The CEO was right. Withdrawal was not an option "[s]o long as a Member continued to hold any Shares." JA364, §5.03.

### d. *The Trustee's "public policy" argument undermines her interpretation.*

The Trustee concludes by implying it would be against "public interest" to interpret the Operating Agreement as written. *See* RB 30. She does not elaborate, aside from suggesting it would not be "right" or "equitable" for the ESH List to "have no one listed upon it." *Id*. This argument has no merit.

The Trustee agrees that the *whole* Operating Agreement must be enforced as written. RB 26-30. She does not claim any provision of it is void or unenforceable for public policy reasons. *Id*. She does not even identify a public policy to support her interpretation.[5] Nor could she, because the Virginia LLC Act at large must be "construed in furtherance of *the policies of giving maximum effect to the principle of freedom of contract and of enforcing operating agreements*." Va. Code § 13.1-

---

[5] It is unclear what "public interest" the Trustee is concerned with. For example, the LLC Act contemplates LLCs without members. *See* Va. Code § 13.1-1003(f)(2) (allowing "an organizer" to act when "no members have been admitted" to an LLC); Va. Code § 13.1-1011.1(B) (same, for corrections); Va. Code § 13.1-1014(B) (same, for amendments); Va. Code § 13.1-1014.1 (same, for restatements).

1001.1. Those are the real policies at play, and the Trustee cannot undermine them by broadly appealing to some vague notion of "public interest."

There is also no evidentiary basis for the Trustee to suggest that enforcing the Operating Agreement might result in an ESH List with "no one listed upon it." *See* RB 30. If that evidence was in the record, she would cite it rather than an argument by an attorney who represented "the last two standing" – i.e., the last two Members who terminated their employment with the Firm. JA552. The Trustee, however, has already rejected the premise of that argument: "it's an unfortunate result for whoever the last two are. But if that's what the document says, that's what the document says." JA554. The Operating Agreement still says what it says.[6] *See Bentley Funding Grp., L.L.C. v. SK&R Grp. L.L.C.*, 269 Va. 315, 330 (2005) ("It is the court's duty declare what the instrument itself says it says.") (quoting *Ames v. Am. Nat. Bank*, 163 Va. 1, 38 (1934)).

Finally, there is nothing "right" or "equitable" about using an inaccurate ESH List to saddle former Members with years of tax liability for cash collected and kept by the Firm after they left. The departing Members did nothing wrong. The Firm "candidly *wanted* people to leave" – "to get off the payroll and to make sure their client work was supported." JA401. LeClair and dozens of others consequently did

---

[6] LeClair takes no position on whether "the last two standing" should be treated any differently than anyone else. LeClair's position is simply that *he* does not belong on the ESH List because *his* employment with the Firm ended on July 31, 2019.

what the Firm asked. The Trustee has yet to articulate anything wrong with that, *see* RB 1-37, and there is no reason why LeClair or anyone else should voluntarily pay the Estate's subsequent taxes on cash it collected and kept. *C.f. United States v. Ismail*, 97 F.3d 50, 57 (4th Cir. 1996) ("Anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.") (quoting *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (L. Hand, J.), *aff'd* 293 U.S. 465 (1935)).

The Trustee's public policy argument illustrates that her interpretation is driven by the tax outcome she wants rather than the plain language of the Operating Agreement. She gives no other explanation for her continued reliance on a fragment of one sentence that says the opposite of what she claims. *See* RB 26-30.

\* \* \* \*

The plain language of the Operating Agreement, construed as a whole, is clear: (1) The Firm "purchased and redeemed" LeClair's Shares on his last day of employment, JA339-344, §2.02; and (2) "As soon as" LeClair "ceased to hold any shares," he was "no longer [] a Member" of the Firm. JA364, §5.03. There was no "exception" to "Section 2.02's blanket resignation-and-redeem rule" – "following" dissolution or otherwise.

The inquiry ought to end here.

14

II.    **If there was a "post-dissolution" exception, it would not affect the outcome because the Firm did not dissolve while LeClair was a Member.**

After reading a post-dissolution exception into the Operating Agreement, the Trustee next argues that the Firm was dissolved before LeClair left. This is the second step of the Trustee's two-step legal theory that LeClair remains a Member.

   a. *The Firm pursued Chapter 11 bankruptcy <u>in lieu</u> of state-law dissolution.*

The premise of the Trustee's second argument is that the Firm was dissolved on July 29, 2019 – after LeClair tendered his resignation on July 26, but before his employment ended on July 31. *See* RB 31-37. That premise is belied by the July Resolutions and everything that followed.

The July Resolutions are clear that those who approved them appointed a Dissolution Committee to dissolve the Firm *in the future*. JA266-268. That is why they resolved "that the Firm shall be dissolved . . . *upon the Effective date established by the Dissolution Committee.*" JA266. That is why they "authorized, empowered and directed" the Dissolution Committee "to liquidate and dissolve the Firm, *with such dissolution to be effective as of such date as the Dissolution Committee shall determine.*" JA266. That is why they resolved "that the Dissolution Committee be, and it hereby is, *empowered to determine the Dissolution Effective Date.*" JA267. And that is why "*any such determination by the Dissolution Committee shall be dispositive* for purposes of the [July Resolutions]." JA267. Clearly, the Firm was not

15

dissolved the moment it adopted the July Resolutions and appointed a Dissolution Committee to dissolve it in the future.

The Dissolution Committee's subsequent conduct likewise confirms that the Firm was not dissolved. OB 34-35. Not even the Trustee disputes that the Dissolution Committee never established a "Dissolution Effective Date." *See id*.; RB 31-32. She also overlooks the Dissolution Committee's August Resolutions, which recited that the July Resolutions "authorized the dissolution of the [Firm] *on such Effective Date as shall be determined by the* [*Dissolution*] *Committee*." JA211. The Firm, however, did not dissolve. After reviewing "various alternative methods and processes associated with liquidating the [Firm]," the Dissolution Committee instead decided "to seek relief on behalf of the [Firm] under chapter 11 of the Bankruptcy Code." JA211-213.

The Firm's continued operations after July 29, 2019 demonstrate it had not been dissolved because its attorneys continued practicing law. See JA661-677 (Thompson Declaration). Tellingly, the Firm's "wind down plan" was patterned "on other law firm cases in which *the firm contemplated a short period of operation* while client matters were smoothly transition to other firms." JA668. The Firm consequently used "existing staff during the transition period *to take care of crucial client issues*," JA668, as it "focus[ed] its attention on . . . protecting [its] clients' interests *while active matters* and client records [were] transferred." JA672. One of

16

the goals of this approach was "to ensure that LeClairRyan *fulfill*[*ed*] *its obligations to its clients*," JA688, which is why LeClair and other attorneys continued practicing law through their departure dates. JA410; *see* JA38 (compiling departure dates). The Trustee concedes this point by claiming they could not have practiced law after dissolution. *See* RB 28 ("[T]he Firm no longer existed post-dissolution except for wind-up purposes, and LeClair Ryan attorneys could not continue to practice law at the Firm following July 29, 2019.") (quoting District Court); JA1069-1070.

Finally, the Dissolution Committee's decision to pursue a Chapter 11 bankruptcy proceeding (under federal law) in lieu of out-of-court dissolution (under Virginia law) verifies the Firm had not been dissolved. OB 34-35, 43-46. Bankruptcy was not the original plan. JA266-268; JA211-213; JA667-669. Far from it, the July Resolutions contemplated an orderly dissolution and liquidation "in accordance with, and pursuant to . . . the Virginia Limited Liability Company Act." JA266. The Firm only resorted to bankruptcy when its "Lender was unwilling to provide funding for an out-of-court wind down plan." JA668-667. As a result, the Firm "commenced th[e] bankruptcy case," in lieu of out-of-court dissolution, "to ensure that it [could] continue to use cash collateral *to pay necessary expenses of its operations*." JA669.

These undisputed facts lead to one conclusion: the Firm was not dissolved before it petitioned for Chapter 11 bankruptcy. There would be no bankruptcy proceeding if the Firm had followed through with its original out-of-court

17

dissolution plan under Virginia law. *See* RB 36 (conceding the "[July][7] Resolution does not mention bankruptcy").

**b.  *The Firm was not dissolved on July 29, 2019.***

The Trustee alternatively argues that, by operation of Sections 11.01 and 11.02 of the Operating Agreement, the Firm was effectively dissolved on July 29, 2019 (despite the clear statements in the July Resolutions that any dissolution would have only been effective on a to-be-established future date). *See* RB 31-32. Her reliance on Section 11.01 – and, by extension, Section 11.02 – is misplaced because Section 11.01 was *one* of two conditions precedent to dissolution. OB 36. Compliance with Section 11.01, alone, was insufficient.

Section 11.01 simply prohibited dissolution unless a majority of those who held "Common Shares" elected to move forward. JA385. It said: "The [Firm] shall be dissolved and [its] affairs wound up only upon the occurrence of . . . An election to dissolve . . . made by holders of a majority of the Common Shares." JA385, §11.01. This did not mean that the Firm could be unilaterally and immediately dissolved "by holders of a majority of the Common Shares." JA385, §11.01. It meant the Firm could not be dissolved without their approval.

---

[7] The Trustee assumes her own conclusion by referring to the July Resolutions as the "Dissolution Resolution." *See* RB 8. This has caused confusion in the past. *See* OB 46 n.15.

The other condition precedent to dissolution was in Section 9.08(i), which separately required approval by the Members who held "Preferred Shares." JA380. That was one of several "Preferred Share Protective Provisions":

> At any time when Preferred Shares are outstanding, the [Firm] shall not, either directly or indirectly . . . do any of the following without (in addition to any other vote required by law, this Agreement or the Management Statement) the written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred] Shares . . . : (i) liquidate, dissolve or wind-up the business and affairs of the [Firm].

JA380, §9.08(i)-(i)(i). This language was clear that dissolution required compliance with the "Preferred Share Protective Provisions." JA380. So while Section 11.01 required an election by Members who held Common Shares, JA385, Section 9.08(i)(i) *also* required "the written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred] Shares." JA380.

Section 11.02, in turn, came into play if – and *only* if – there was compliance with both the Preferred Share approval requirement in Section 9.08(i)(i) and the Common Share approval requirement in Section 11.01(i). JA380; JA385. Had that happened – i.e., *both* conditions precedent to dissolution were satisfied – then Section 11.02 *may*[8] have fixed the "effective" date. JA385. Here, though, that did not happen because both conditions precedent to dissolution were never satisfied.

---

[8] Section 12.14 authorized the Members who approved the July Resolutions to amend Section 11.02. *See infra* at 22-23. Accordingly, to the extent Section 11.02

### c. *The Firm could not have dissolved before LeClair left.*

The Trustee does not dispute that Section 9.08(i)'s "Preferred Share Protective Provisions" prohibited dissolution without the "written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred] Shares." *See* RB 31-37. Nor does she dispute that LeClair held "a majority of the then outstanding [Preferred] Shares" on July 29, 2019. JA518. She does not even dispute that LeClair never gave his "written consent or affirmative vote" for the Firm to dissolve. JA518. Instead, the Trustee argues the Firm was dissolved on July 29 because LeClair: (i) was not "entitled to vote" after he tendered his resignation, or (ii) alternatively, he "ratified" an unauthorized dissolution. Both arguments fail.

> i. Dissolution required LeClair's "written consent **or** affirmative vote," but he never gave either.

The Operating Agreement was clear that dissolution required "the written consent <u>or</u> affirmative vote of the holders of a majority of the *then outstanding* [Preferred] Shares." JA380, §9.08(i)(i). LeClair did not forfeit that or any of the other "Preferred Share Protective Provisions" when he tendered his resignation. *See* OB 35-40. Because of several recent Member departures, LeClair had become "the holder[] of a majority of the then outstanding [Preferred] Shares." JA518-519. That

---

may have otherwise assigned an "effective," the July Resolutions necessarily amended Section 11.02 by postponing the effective date until "such date as the Dissolution Committee shall determine." JA266; JA267 ("[A]ny such determination by the Dissolution Committee shall be dispositive . . . .").

20

remained true after LeClair tendered his resignation on July 26, 2019, and until the Firm redeemed his Shares on July 31. Before August, the Firm could not have dissolved without LeClair's "written consent or affirmative vote." JA380, §9.08(i).

The Trustee's competing argument reads too much out of Section 9.08(g). *See* RB 34-35. While she is correct that LeClair's resignation triggered Section 9.08(g), meaning he was not "entitled to vote" at the July 29 meeting, JA379-380, she incorrectly assumes that Section 9.08(g) overrode the "Preferred Share Protective Provisions" in Section 9.08(i). RB 35. Her theory has two flaws.

*First*, regardless of whether LeClair was "entitled to vote," the Firm could not dissolve without *either* his "written consent <u>or</u> affirmative vote." JA380, §9.08(i). That was a limitation on the Firm, not LeClair, and the Firm needed one or the other. As a result, it makes no difference whether LeClair was "entitled to vote" under Section 9.08(g) because dissolution required, at a minimum, his "written consent." JA380, §9.08(i). The Trustee does not address this point. *See* OB 40; RB 31-37.

*Second*, Sections 9.08(g) and 9.08(i) differed in focus, with Section 9.08(g) focused on who was "entitled to vote" while 9.08(i) focused on the holders of "then outstanding" Preferred Shares. *See* OB 38-40. LeClair has also explained the significance of this distinction, *id*., but the Trustee does not address it either. *See* RB 31-37. She simply ignores the difference between "entitled to vote" and "then outstanding" by summarily claiming "the District Court aptly 'read Section 9.08(i)

21

as requiring the vote of the majority of then outstanding Preferred shares *entitled to vote*.'" *Id*. at 35 (emphasis added by District Court and kept by Trustee). This proves LeClair's point because those italicized words were not in Section 9.08(i). JA380. The Trustee offers no explanation for why she reads "entitled to vote" out of Section 9.08(g) and into Section 9.08(i), which said "then outstanding."

Section 9.08(i) was not, as the Trustee implies, the only provision of the Operating Agreement that applied regardless of who was "entitled to vote." *See* RB 35. She overlooks Section 12.14, which worked the same way. JA390. Section 12.14 began with a broad rule that allowed voting Members to amend the Operating Agreement at a "meeting," but then it included two specific exceptions. JA390. The first exception prohibited amendments that reduced the value or lengthened the "time within which [Common or Preferred Shares] may be purchased or redeemed," unless "each such affected Member" gave his or her "affirmative vote or consent." JA390, §12.14. The second exception prohibited interference with the "rights, powers, preferences and other terms of the [Preferred Shares]," unless waived "by the *affirmative written consent or vote of the holders of a majority of* [*Preferred Shares*] *then outstanding*." JA390, §12.14. Accordingly, the Members who were "entitled to vote" at a meeting could not, alone, devalue or prolong the redemption of any Member's Shares. Nor could they, alone, abolish the "Preferred Share Protective Provisions." This also meant they could not, alone, dissolve the Firm.

22

Here, then, it did not matter whether LeClair was "entitled to vote," JA379-380, §9.08(g), because dissolution required the "written consent or affirmative vote of the holders of a majority of the then outstanding [Preferred] Shares." JA380, §9.08(i). That aspect of "Firm democracy" never changed. *Contra* RB 34-35. Because LeClair held "a majority of the then outstanding [Preferred] Shares" until they were redeemed on July 31, 2019, JA518, and because LeClair never gave his "written consent or affirmative vote" in the interim, JA518, the Firm could not have dissolved on July 29, 2019.

> ii.  LeClair never "ratified" the Firm's purported dissolution.

The Trustee's alternative "ratification" argument assumes the Firm was dissolved – it was not, *supra* Part II(b)-(c)(i) – and that LeClair somehow ratified an unauthorized out-of-court dissolution by participating in this federal bankruptcy case. *See* RB 35-36. LeClair thoroughly addressed this theory in his opening brief. OB 41-47. He explained that an out-of-court dissolution under the LLC Act cannot be conflated with a bankruptcy proceeding under federal law. *Id.* at 43 (citing cases). The Trustee does not acknowledge or respond to those arguments. *See* RB 35-36.

There is, however, one thing that requires clarification: LeClair has never implied "that the filing of the Bankruptcy Case was the equivalent of the dissolution trigger contained in the [July] Resolution." RB 36. That is the opposite of his position. OB 43 (explaining "'dissolution' under Virginia law" and "'bankruptcy'

23

under federal law" are "two separate and distinct statutory processes"). LeClair agrees with the Trustee's statement that the "filing of the Bankruptcy Case was not the trigger of dissolution." RB 26. This is another reason why he did not "ratify" any purported out-of-court dissolution by participating in the federal bankruptcy proceeding. *See also* OB 43-47.

## III. The Trustee cannot bypass the merits by mischaracterizing LeClair's arguments as "new."

The Trustee's brief does not meaningfully address LeClair's legal arguments. *See* RB 20-37. She merely urges this Court to ignore what she characterizes as "new" appellate arguments. *Id*. The Trustee does this at least three times. *Id.* at 29, 32-33, 34. She is mistaken each time.

LeClair has maintained, at all stages of this case, that the Firm redeemed his Shares and he was no longer a Member once his employment ended. JA43-45; JA299-300; JA479-482; JA519-522; JA556; JA1008; JA1015-1019. That is still his position. OB 23-33. It is based on the plain language of the Operating Agreement, including Section 5.03. *Id*. LeClair's interpretation has not changed.[9]

---

[9] *Compare* RB 29 ("LeClair for the first time on appeal fabricates a new twist for Section 5.03 . . . that said section is only applicable in connection with 'disassociation' of members."), *with* JA48 (LeClair: "The plain meaning of Section 5.03 links member withdrawal to the ownership of shares . . . . This avoids the ethical quagmire where a lawyer holds an ownership interest in more than one law firm."), *and* JA522 (LeClair: "[M]embership is tied to the ownership of shares . . if a person wishes to withdraw as a member, they must terminate their employment.").

LeClair has likewise maintained that the Firm was not validly dissolved on July 29, 2019 or any other time while he was a Member. That was his position in the Bankruptcy Court. JA480-481; JA520-522. That was his position in the District Court. JA45; JA53-65; JA1019-1021. That is his position now. OB 33-47. LeClair has never wavered.[10]

Finally, the *Trustee* acknowledged her "own actions demonstrate that the Firm was not dissolved on July 29, 2019." RB 34. LeClair explained that in the District Court, JA54, where "the Trustee correctly note[d] that the Firm ha[d] not yet legally, fully dissolved under Virginia law." JA1066. The Trustee cannot dispute her own concession – especially as she continues to concede the Firm *still* has not been "dissolved and completely wound up" – while relying on a sentence fragment that applied "*prior* to the dissolution *and* winding up of the [Firm]." JA483, §5.03. Her dueling arguments are self-defeating. RB 34 (acknowledging "the conjunctive 'and' requires that both conditions be met").

---

[10] *Compare* RB 32-33 (claiming LeClair's argument that "the Firm filed the Chapter 11 Bankruptcy Case in lieu of dissolving . . . is raised for the first time on appeal"), *with* JA550 (LeClair: "[W]e are not in any way challenging the validity of the bankruptcy . . . [but] to the extent that there is any sort of resolution that says the [Firm] shall be dissolved on July 29th, that would be [in violation of] preferred share protection provisions."), *and* JA54 (LeClair: "There was no evidence that the Committee selected a dissolution date – because it never did . . . . Instead, the Committee filed for bankruptcy months later, in September 2019.").

The Trustee cannot point to any "new" arguments on appeal. The Bankruptcy and District Courts considered the same issues now before this Court. JA564-574; JA1031-1075. They ruled on those issues, albeit incorrectly, and the Trustee is wrong to suggest LeClair waived or forfeited them. *See De Simone v. VSL Pharm., Inc.*, 36 F.4th 518, 528 (4th Cir. 2022) ("Variations on arguments made below may be pursued, so long as the appealing party asked both courts to evaluate the same fundamental question.") (cleaned up; quotations omitted).

## CONCLUSION

LeClair must be removed from the ESH List. His Shares were "deemed sold and transferred" when his employment ended on July 31, 2019. JA344, §2.02(g). "As soon as" that happened, LeClair "cease[d] to hold any Shares" and was "no longer [] a Member," JA364, §5.03, or an "equity security holder." *See* 11 U.S.C. § 101(16)-(17). There was no post-dissolution "exception" to Section 2.02's "resignation-and-redeem rule" and, even if there was, the Firm could not have dissolved without LeClair's "written consent or affirmative vote." JA380, §9.08(i).

For the reasons stated in LeClair's opening brief, and reiterated above, the Court should reverse the judgment below and remand this case with instructions for LeClair's removal from the correctly-dated ESH List. *See* JA1032.

**GARY D. LECLAIR**


By: /s/ David R. Berry
         Of Counsel

Monica T. Monday (VSB No. 33461)
Andrew M. Bowman (VSB No. 86754)
David R. Berry (VSB No. 90554)
GENTRY LOCKE
P.O. Box 40013
Roanoke, Virginia 24022-0013
Telephone: (540) 983-9300
Facsimile: (540) 983-9400
Email: monday@gentrylocke.com
Email: bowman@gentrylocke.com
Email: berry@gentrylocke.com

*Counsel for Appellant,*
*Gary D. LeClair*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this brief complies with the page and type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) in that it contains 6,473 words (including words within images), excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Microsoft Word and contains 14-point, Times New Roman font.

By: /s/ David R. Berry
Of Counsel

28